NATIONAL SOLID WASTE MANAGEMENT ASSOCIATION, Plaintiff,

v.

George V. VOINOVICH, Governor State of Ohio, et al., Defendants.

No. C2–89–85.

United States District Court,
S.D. Ohio.

May 1, 1991.

Michael Roy Szolosi, Columbus, Ohio, for plaintiff.

Bryan Frank Zima, Ohio Atty. Gen., Columbus, Ohio, for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

Plaintiff, National Solid Waste Management Association (NSWMA), brings this action challenging the constitutionality of certain provisions of Ohio's solid waste disposal statute. Ohio Rev.Code § 3734.131 and § 3734.57. The NSWMA asserts that the Act violates the Commerce Clause of the U.S. Constitution, art. I., § 8, by discriminating against and placing undue burdens on interstate commerce. This cause is currently before the Court on the parties' respective Motions for Summary Judgment and on the State's Motion to Dismiss plaintiff's challenge to § 3734.131.

On June 24, 1988, Governor Richard Celeste signed House Bill # 592, amending Ohio Rev.Code §§ 3734.01 et seq., into law.[1] The statute is a comprehensive scheme designed to correct past improper waste disposal practices.[2] Under the Act, disposal

---

1. The Act as signed into law differs significantly from the text of the bill approved by the Ohio General Assembly. Governor Celeste vetoed provisions of the bill which expressly excluded importation of solid wastes generated outside of the state and which imposed a $75.00 per ton tax on such wastes.

2. It appears that since the early 1970s, Congress and the States have endeavored to remedy the perceived waste disposal crisis. In 1976, Con-

of all solid waste in Ohio is regulated by Ohio's Director of Environmental Protection as well as management districts which may include one or more counties. Each of these districts is required to prepare solid waste management plans which provide for the disposal of waste that is generated within the district. In addition, the districts are given substantial leeway to levy fees on the disposal of waste within their own jurisdictions.

The Act, as characterized by defendants, includes four major components. It upgrades the technical requirements for solid waste disposal and improves enforcement of the solid waste requirements. It creates a comprehensive solid waste disposal planning program to ensure adequate capacity for the state disposal of waste. It creates a background investigation program to ensure the reliability of operators of solid waste facilities. Finally, it provides funding mechanisms to finance the programs and provide the revenue required by the Comprehensive Environmental Response Compensation Liability Act, amending 42 U.S.C. § 6901 *et seq.*

Many of the provisions of the Act have yet to become effective. Plaintiff admits that these provisions are not yet ripe for judicial consideration and reserves the right to challenge those provisions at a later date. The present action is limited to the provisions of Ohio Rev.Code § 3734.57 and § 3734.131.

Specifically, Section 3734.57(A) imposes fees on the disposal of waste, the amount of which is determined by the source of the wastes' origin. Section (A)(1) imposes a tax of seventy cents ($.70) per ton on wastes generated within a management district.[3] On the disposal of wastes generated outside of the management district but within the state, a fee of one dollar and twenty cents ($1.20) per ton is imposed. Finally, a fee of one dollar and seventy cents ($1.70) per ton is levied on wastes generated outside of the state.

Section (B) authorizes the individual districts to impose fees, in addition of those required by Section (A) on the basis of tons or cubic feet of wastes disposed. Fees levied on wastes generated within the district are required to be no more than one half of the fees imposed on wastes generated outside of the district but within the state. Fees imposed on wastes from outside the state must be three times the amount of the tax on wastes from within the district. In addition, under Section (C), a municipal corporation or township in which a solid waste disposal facility is located may levy a fee of no more than twenty-five cents ($.25) per ton on wastes disposed of at the facility regardless of where the wastes are generated.

Certain wastes are excluded from the tax provisions under Section (D). Wastes which are disposed of at a facility which is owned by the generator of the wastes are exempt. Wastes generated from the combustion of coal or those from outside of the district but which are covered by an agreement for the joint use of disposal facilities are also tax exempt. Likewise, waste which is incinerated or disposed of in an energy recovery facility may not be taxed.

gress passed the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.,* which addressed environmental concerns relating to the disposal of waste materials. It did not, however, include a comprehensive regulatory scheme to deal with waste disposal. In response, the individual states began enacting their own disposal management statutes. Most notably, New Jersey enacted legislation which imposed an outright ban on the importation of waste from other states, and which was subsequently struck down by the Supreme Court as being violative of the Commerce Clause of the U.S. Constitution. *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). In 1980, the EPA adopted regulations designed to carry out the provisions of the RCRA, but these were also found to be inadequate. Finally, in 1980, Congress passed the Comprehensive Environmental Response Compensation Liability Act, which required states to pay 10% to 50% of the cost of clean-up of dumps owned by the states. House Bill # 592 is the most recent effort by the Ohio General Assembly to keep pace with the federal regulatory requirements.

3. The Act provides for increases over a two year period. The amounts reflected above are those in effect twenty-four months after the effective date of the Act.

In addition to Ohio Rev.Code § 3734.57, the Act requires consent to jurisdiction and service of process prior to the transportation of wastes into the state. Ohio Rev. Code § 3734.131. Solid wastes may not be transported into the state unless each of the following persons consents in writing to the jurisdiction of the courts of the State of Ohio:

(a) The person who actually transports the waste;

(b) The business concern that employs the person described in division (A)(1)(a) of this section;

(c) The person or persons who have contracted with the transporter for transportation of the waste to a facility in this state;

(d) The person or persons who have contracted with the owner or operator of the facility for treatment, transfer, storage, or disposal of the waste at the facility in this state.

The consent-to-service document is required to be filed three days before transportation of solid wastes into the state and must be renewed every four years. Furthermore, no owner or operator of a solid waste treatment facility may accept shipment of waste unless a copy of the consent-to-service document is received at the facility.

Plaintiff, National Solid Waste Management Association, is a not-for-profit trade association whose members are engaged in the solid waste management business. The association is charged with protecting the interests of its members and assisting governments with development and refinement of laws and regulations relating to waste management. Members of the NSWMA are engaged in the business of disposing of solid wastes in Ohio and other states and are currently shipping and receiving solid wastes for disposal in Ohio.

The NSWMA brings this cause of action challenging the constitutionality of Ohio Rev.Code §§ 3734.57(A) and (B), and § 3734.131. Specifically, the NSWMA asserts that the Act discriminates against the disposal of out-of-state wastes by imposing taxes that are 42% to 300% higher than those imposed on in-state wastes, and by allowing for a separate tax structure to be imposed by the management districts under which out-of-state wastes must be taxed at three times the rate of in-state wastes. In addition, plaintiff claims that the provisions of § 3734.131 impose highly burdensome and unnecessary filing requirements on persons who import solid wastes. Plaintiff asserts that these provisions violate the Commerce Clause of the U.S. Constitution, art. I, § 8, by unduly discriminating against the disposal of out-of-state wastes and by placing undue burdens on interstate commerce.

■ We note the procedural context of the case. Plaintiff filed its Motion for Summary Judgment before the State answered the complaint. The State moved for a continuance to respond until time for discovery had been provided. This Court granted the extension and aided the parties in discovery, after which the State filed its Memorandum in Opposition and its own Cross–Motion for Summary Judgment. On January 10, 1991, plaintiff moved this Court for leave to file notice of additional authority which was granted. The State responded in accordance with Rule 4.0.2 of the Rules for the U.S. District Court for the Southern District of Ohio. Thereafter, plaintiff filed a responsive memorandum to which the State moved to strike arguing that the response was not allowed by Order of the Court or by rule. Finding both that plaintiff's response is not warranted by Rule and that additional authority and arguments are unnecessary, we hereby GRANT the State's motion to strike and do not consider plaintiff's Reply to defendant's Responsive Memorandum Regarding the *Government Suppliers* Decision. Finally, on February 1, 1991, the State moved the Court to Dismiss for mootness plaintiff's challenge to Section 3734.131 on the basis of legislative amendment. As we note below, the State's motion to dismiss is without merit; therefore we proceed to resolve the parties' respective motions for summary judgment.

The State denies the claims and asserts that the Court should abstain from consid-

ering the allegations, that the NSWMA lacks standing to bring suit, and that the challenge to § 3734.57(B) is not yet ripe for review. Plaintiff now moves this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for an Order granting Summary Judgment in its favor, arguing that no genuine issues of material fact need be resolved at trial. The State has also Cross–Motioned for an Order granting Summary Judgment in their favor.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner,* 570 F.2d 107, 111 (6th Cir. 1978). Summary judgment, therefore, will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *accord Adams v. Union Carbide Corp.,* 737 F.2d 1453, 1455–1456 (6th Cir.1984). The moving party is entitled to summary judgment "where it is quite clear what the truth is and where there are no unexplained gaps in documents submitted by the moving party pertinent to material issues of fact." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *accord County of Oakland v. Berkley,* 742 F.2d 289, 297 (6th Cir.1984); *Adickes,* 398 U.S. at 157–60, 90 S.Ct. at 1608–10; *Smith v. Hudson,* 600 F.2d 60, 65 (6th Cir.), *cert dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

If the moving party meets its burden and if adequate time for discovery has been provided, the opposing party is required to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof as well. *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The mere existence of a scintilla of evidence in support of the opposing party's motion will be insufficient; plaintiff "must set forth *specific facts* showing that there is a genuine issue for trial." *Davis v. Robbs,* 794 F.2d 1129, 1130 (6th Cir.1986) (emphasis in original). As is provided in Fed.R.Civ.P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Therefore, a party may not rest on the allegations contained in his pleadings to overcome a properly supported motion for summary judgment. *First National Bank v. Cities Service Co.,* 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968) (footnote omitted).

Before a ruling on a motion for summary judgment can be made, the dispositive issues and factual inquiries relevant to the motion must be clearly delineated. With this standard in mind, the Court will proceed to consideration of the pending motion.

### Standing

In its cross-motion, the State asserts that the NSWMA lacks standing to seek redress for the alleged injuries to its members. Federal courts have power to hear and decide only cases which are autho-

rized by Article III of the Constitution or statutes enacted by Congress. *Bender v. Williamsport Area School District.*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). At a minimum, Article III requires that the party who invokes the court's authority "show that he has personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). The party must also show that the injury can be fairly traced to the challenged action and that it is likely to be redressed by a favorable opinion. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

Beyond the Constitutional requirements, there are also prudential limits. *Clonlara, Inc. v. Runkel,* 722 F.Supp. 1442 (E.D.Mich.1989). A plaintiff must also fall within the "zone of interest arguably protected by the constitutional provision in question." *Id.* at 1450. *See also* WRIGHT, MILLER & COOPER, *Federal Practice and Procedure:* Jurisdiction 2d § 3531.2.

The NSWMA bears the burden of affirmatively showing that jurisdiction is proper. The factual predicate for jurisdiction must be demonstrated from the record and may not be inferred. *Bender,* 475 U.S. at 547, 106 S.Ct. at 1334. Moreover, as NSWMA is a representative association, it carries additional burdens to show that it has standing.

An association may have standing to assert the claims of its members even if it has suffered no injury from the challenged activity. *Warth v. Seldin,* 422 U.S. 490, 511, 515, 95 S.Ct. 2197, 2211, 2213, 45 L.Ed.2d 343 (1975), *National Motor Freight Traffic Asso. v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963), *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It must allege that its members, or any one of them, are suffering immediate or threat-

ened injury as a result of the challenged state action of the sort that would make out a justiciable case had the members brought suit on their own behalf. *Warth* 422 U.S. at 511, 95 S.Ct. at 2211. If this can be established, and if the nature of the relief sought does not render each member indispensable to the suit, the association may be the appropriate representative of its members and be entitled to the court's jurisdiction. *Id., see also NAACP v. Alabama,* 357 U.S. 449, 458–460, 78 S.Ct. 1163, 1169–1171, 2 L.Ed.2d 1488 (1958); *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 183–187, 71 S.Ct. 624, 653–656, 95 L.Ed. 817 (1951) (Jackson, J., concurring); *Gillis v. United States Dep't. of Health and Human Services,* 759 F.2d 565 (6th Cir.1985). Therefore, in order for an association to assert representational standing, it must establish that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Com.,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *accord Bronson v. Board of Education,* 573 F.Supp. 767 (S.D.Ohio 1983), *Clonlara, Inc. v. Runkel,* 722 F.Supp. 1442, 1451 (E.D.Mich.1989), *Huebner v. Ochberg,* 87 F.R.D. 449, 453 (E.D. Mich.1980), *Gillis v. United States Dept. of Health & Human Services,* 759 F.2d 565 (6th Cir.1985). After reviewing the pleadings and affidavits, the Court concludes that the NSWMA meets the indicia of *Hunt* and has standing to bring the present claims.

It is clear that the members of the NSWMA may raise identical claims in their own right as to all three of the issues presented because each member which imports solid waste into Ohio is currently subject to the taxing scheme and filing requirements of the Act.[4] Secondly, the

---

4. The State attempts to show that the NSWMA does not suffer any injury by alleging that it is

its members' refusal to sign the consent-to-sue form which has caused their injuries rather

express purpose of the organization is to protect the interests of those engaged in the business of solid waste management, thus, it meets the second prong of *Hunt.* Finally, the participation of the individual members is not required for effective adjudication of the claims. Since plaintiff attacks the Act as being unconstitutional on its face, an actual application of the provisions is not necessary. We need not consider the separate factual scenarios involving the individual members because they will not have a bearing on the constitutional issues presented.

Despite the fact that the criteria of *Hunt* have unquestionably been met, the State challenges the NSWMA's standing by citing *National Collegiate Athletic Association v. Califano,* 622 F.2d 1382 (10th Cir. 1980), for its position that if "certain members" of an association are opposed to the suit, it strips the organization of standing. The contention is meritless as *Califano* does not support the proposition for which it is cited. The *Califano* Court stated that "if *more members* of the association declare against the association's position than declare in favor of it, the association does not have standing." *Id.* at 1392 (emphasis added).[5] This circuit is in accord. In *Gillis,* 759 F.2d at 573 (6th Cir.1985), the court held that as long as the association has alleged an actual or threatened injury to any one of its members, a conflict between

the association's members does not strip it of standing.

The State's claim that the NSWMA has failed to allege that it has the support of its membership is also without merit. The NSWMA has provided affidavits of the president or vice president of three of its member corporations, each of which have claimed actual injury stemming from the Act. Having alleged actual injury to its members "or any one of them," *Warth* 422 U.S. at 511, 95 S.Ct. at 2211, plaintiff has secured representational standing. Moreover, our reading of *Gillis* and *Califano* indicates that the State bears the burden of showing that the association does not have the support of its members. The State has failed entirely to show that *any* of the NSWMA's members oppose its position, and, contrary to its brief, there is no authority which suggests that plaintiff must supply the Court with the results of vote by the membership showing its support for the action nor is the State entitled to an inference that the NSWMA does not have the support of its members.[6] *See e.g. National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1233 (D.C.Cir.1987).

In its responsive memorandum regarding the December 27, 1991 decision in *Government Suppliers Consolidating Services Inc. v. Bayh,* 753 F.Supp. 739[7] (S.D.Ind. 1991) the State again attempts to circum-

---

than the provision itself. The argument is meritless. Viewed from plaintiff's perspective, § 3734.131 imposes burdens on transporters of solid waste who are unwilling to submit to the jurisdiction of the Ohio courts. Since plaintiff questions whether the State can impose such burdens, the mere requirement is injury enough for the individual members to bring suit on their own behalf.

**5.** *Califano* is also inapposite to the case at bar. There, the NCAA was challenging regulations which would place women's intercollegiate sports programs on par with the men's. Many of the colleges which belonged to the NCAA also belong to a women's international collegiate sports association, the AIAW, which was on the other side of the litigation. In that situation, it was incumbent on the NCAA to show that most of its members supported the action. There is no such demonstrable split in the NSWMA's

membership, thus, the Court may assume that the NSWMA has the support of its members.

**6.** The State offers the affidavit of E. Dennis Muchnicki, Chief of the Environmental Enforcement Section of the Ohio Attorney General's Office, in which he claims to have received a phone call from counsel for a non-Ohio solid waste disposal company who opposes the NSWMA's suit. He fails, however, to identify either the caller or the company. Moreover, the fact assertion in the affidavit (the unidentified caller's assertion that the solid waste disposal company he represents opposes the suit) is inadmissible hearsay. The affidavit does not establish that there is difference of opinion amongst the membership much less that a majority of members oppose this suit.

**7.** On January 10, 1991, plaintiff was granted leave to file notice of additional authority. See discussion at pg. 261, *infra,* fn. 11.

vent the criteria of *Hunt* by arguing that the NSWMA lacks standing because it may pass the cost of its injuries to its customers. The State relies on that portion of *Government Suppliers* in which the court indicated in *dictum* that there may be middle level trash brokers who would not be seriously affected by solid waste taxing schemes such that their asserted role could only be to protect the national marketplace. Such a generalized grievance would not be sufficient to serve as the basis for standing. *Government Suppliers* at 758. The *Government Suppliers dictum* is of no relevance primarily because the holding of the court squarely addresses the type of standing scenario presented in this case. The *Government Suppliers* Court stated that because the volume of Indiana business would be reduced due to the taxing scheme, the plaintiff had standing even though it may be able to shift some of those losses to its customers. "This is precisely the type of economic injury that is consistently found to satisfy the constitutional injury in fact requirement." *Id.* at 759. The NSWMA has asserted that its members will incur economic hardship to due the Ohio taxing scheme; therefore, it has alleged injury sufficient to support standing.

We note further that unlike the hypothetical trash broker in the *Government Suppliers dictum,* the NSWMA has no means of shifting losses to customers. The NSWMA has no customers to speak of as it is a representative organization comprised of haulers of solid waste, thus it incurs no economic losses directly from the taxing scheme which it may shift to customers. Therefore, we reject the State's reliance on *Government Suppliers* and find that the NSWMA has standing to bring the present action on behalf of its members.

### Ripeness

■ The State asserts that plaintiff's attack on Section 3734.57(B) does not present an issue that is currently ripe for judicial review. Like the doctrine of standing, ripeness is also based on the dual grounds of compliance with Article III of the Constitution and prudential concerns. *Poe v. Ull-*

*man,* 367 U.S. 497, 508–509, 81 S.Ct. 1752, 1758–1759, 6 L.Ed.2d 989 (1961). There is a historically defined limited nature of the function of courts. Within the framework of the adversary system, the adjudicatory process is most solidly based when exercised "under the impact of a lively conflict between antagonistic demands, actively passed, which make resolution of the controverted issue a practical necessity." *Id.* at 503, 81 S.Ct. at 1755; *see also Little v. Bowers,* 134 U.S. 547, 558, 10 S.Ct. 620, 623, 33 L.Ed. 1016 (1890); *California v. San Pablo & T.R. Co.,* 149 U.S. 308, 314, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893); *U.S. v. Fruehauf,* 365 U.S. 146, 157, 81 S.Ct. 547, 553, 5 L.Ed.2d 476 (1961). Justice Frankfurter often wrote of the primary conception of judicial review with regard to the ripeness of claims. "Federal judicial power," he wrote, "is to be exercised to strike down legislation, whether state or federal, only at the insistence of one who is himself immediately harmed or immediately threatened with harm by the challenged action." *Poe* 367 U.S. at 504, 81 S.Ct. at 1756. Whereas standing is designed to determine who may institute an asserted claim for relief, ripeness addresses a timing question: When is it appropriate to bring the asserted claim?

■ The Supreme Court has indicated that the question of ripeness turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Dev. Com.,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Buckley v. Valeo,* 424 U.S. 1, 114, 96 S.Ct. 612, 680, 46 L.Ed.2d 659 (1976); *accord Young v. Klutznick,* 652 F.2d 617 (6th Cir.1981). There is, however, no tried and true method of determining ripeness which this Court is required to apply. Ripeness concerns arise in a multitude of fashions and are appropriately considered in their individual settings. The doctrine requires the court to exercise its discretion to determine if judicial resolution of the case is desirable. *Brown v. Ferro Corp.,* 763 F.2d 798 (6th Cir.1985), *cert. denied,* 474 U.S.

947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985), *United Steelworkers of America, Local 2116 v. Cyclops Corp.*, 860 F.2d 189, 194 (6th Cir.1988).

The State places extraordinary weight on the "two-prong ripeness test" established in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) to support its claim. Its reliance on *Abbott*, however, is misplaced as it does not address the type of ripeness claim the State raises. The trilogy of *Abbott, Toilet Goods Association v. Gardner*, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), and *Gardner v. Toilet Goods Association*, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), examined the extent to which pre-enforcement review of *agency regulations* is authorized and within the jurisdiction of the federal courts. The Court's concern was with the rule-making process of administrative bodies. In this context, the Court stated that the basic rationale of the ripeness doctrine is to "prevent courts, through the avoidance of premature adjudications, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott*, 387 U.S. at 148, 87 S.Ct. at 1515.

■ Although *Abbott* is correctly cited for the general proposition that the fitness of the issues for judicial review and the hardship on the parties of withholding consideration must be reviewed, it deals specifically with rules and orders of administrative agencies rather than the more traditional constitutional challenge to legislative enactments. To that extent, the Court established a three prong test to determine the fitness of the issues which considers whether the claims are purely legal, whether the administrative action is final, and, alternatively, the harm in postponing review. The State attempts to force the case at bar into the *Abbott* mold arguing that the challenge is generalized and that there is likely to be a more concrete, factual setting more appropriate for review in the future. However, we are unable to reconcile the *Abbott* analysis with the present case because we are not dealing with an administrative agency. A constitutional attack on a state statute does not require determination of finality or whether the claims presented are purely legal, nor would it be appropriate to do so. For purposes of the case at bar we need only to determine if there is an actual controversy coupled with immediate or threatened harm. *Young v. Klutznick*, 652 F.2d 617, 625–626 (6th Cir.1981).

■ On the present record, we find that plaintiff's challenge to Ohio Rev.Code § 3734.57(B) is ripe for review. The claim is fit for consideration in the sense that the statute is in effect and currently being applied. In addition, the harm to plaintiff is not abstract or attenuated, but rather, real and concrete. Although the provisions of Section (B) are within the discretion of the individual districts to apply, if they do choose to levy Section (B) fees, the section requires that out-of-state wastes be taxed at three times the rate of in-district wastes. Plaintiff claims that this provision is unconstitutional on its face, therefore, an actual application of the statute is not necessary to ripen the claim for review. *See e.g. Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979), *Black & Decker Corp. v. American Standard Inc.*, 679 F.Supp. 1183 (D.Del.1988), *SCA Services of Indiana, Inc. v. Thomas*, 634 F.Supp. 1355 (N.D.Ind.1986), Courts often conclude that a plaintiff is entitled to challenge the legality of an action that has not yet occurred. *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Com.*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983). Moreover, plaintiff has also produced evidence that several of the management districts have actually adopted discretionary fee provisions. (Plaintiff's Reply, Exh. A). Thus, even if we were to accept the State's position that the claim could not be ripe absent an actual imposition of the alleged discriminatory fees, the fact that these fees

have in fact been adopted compels us to reject its ripeness argument.

The State also asserts that at the time of filing, no district had elected to impose the additional fees, therefore the claim is not ripe for review. Since, however, ripeness is a question of timing, we are not required to consider the suitability of the claims for review purely from the point of filing. It is sufficient that at this juncture an actual controversy exists and the harm to the plaintiff is real and present. Accordingly, we find that plaintiff's claims are ripe for review.

### Abstention

The State's third jurisdictional argument asserts that the Court should properly abstain from consideration of the case at bar under the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). The State alleges that the Act involves a complex regulatory scheme in which the State has an overriding interest and which creates a central forum for review by a tribunal with special competence. For this Court to exercise jurisdiction, the State claims, would unduly burden the State in its efforts to further important state policies.

Abstention is a judicially created exception to the general grant of jurisdiction set forth in Article III of the Constitution. *See Railroad Com. of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The doctrine permits federal courts to postpone or decline the exercise of jurisdiction in order for a state court to have the opportunity to resolve the matters at issue. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976), *reh'g denied*, 426 U.S. 912, 96 S.Ct. 2239, 48 L.Ed.2d 839 (1976). Abstention from the exercise of federal jurisdiction, however, is the exception and not the rule. *Id.* Abdication of the obligation to decide cases can be justified only in the exceptional case where there is an important countervailing state interest which will be served by judicial restraint. *Id.*

The Supreme Court has defined three categories of abstention. *See Accident Fund v. Baerwaldt*, 579 F.Supp. 729, 731 (W.D.Mich.1984). Abstention may be appropriate where the resolution of uncertain state law issues could render the federal constitutional issue moot or cause it to be presented in a different posture. *Pullman*, 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941); *see County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), *Lake Carriers' Asso. v. MacMullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *accord United States v. Anderson County*, 705 F.2d 184 (6th Cir.1983), *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 563 (6th Cir.1982). The Court must abstain from review of cases which would unduly interfere with legitimate activities of the state—most notably, pending state criminal proceedings. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *see also Louisiana Power & Light Co. v. Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959), *United States v. Anderson County.*, 705 F.2d 184 (6th Cir.1983) (asking if there is an adequate state proceeding to raise constitutional challenges in a non-criminal proceeding). Finally, the Court has upheld abstention "where the exercise of federal review of the [state law] question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation District*, 424 U.S. at 814, 96 S.Ct. at 1244 (discussing *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 [1943]).

In the final category, the *Burford* exception, a court may justify abstention where there is a complex state regulatory scheme which would be disrupted by federal review and where there is a state-created

forum with special competence in the particular area. *Burford* at 327, 332–33, 63 S.Ct. at 1104, 1106–07, *ADA–Cascade Watch Co. v. Cascade Resource Recovery, Inc.*, 720 F.2d 897, 903 (6th Cir.1983)., *Carras v. Williams*, 807 F.2d 1286, 1290 (6th Cir.1986), *North Dixie Theatre, Inc. v. McCullion*, 613 F.Supp. 1339, 1343 (S.D. Ohio 1985). In *Burford*, the Texas legislature had centralized the administration of a regulatory scheme for oil and gas in one agency with judicial review in a single state district court. *Burford* 319 U.S. at 325–326, 63 S.Ct. at 1103–1104. The federal courts had consistently interpreted state law which required a specialized knowledge of oil and gas matters. This resulted in uncertainty and confusion in the state's conservation program. The Supreme Court found that these circumstances justified abstention and dismissed the action noting that "delay, misunderstandings of local law, and needless federal conflict with the state policy would be the inevitable product of this double system of review." *Id.* at 327, 63 S.Ct. at 1104.

■ The *Burford* abstention is not appropriately invoked merely because resolution of a federal question may result in the overturning of a state policy. *Zablocki v. Redhail*, 434 U.S. 374, 380 n. 5, 98 S.Ct. 673, 678 n. 5, 54 L.Ed.2d 618 (1978), *Colorado River*, 424 U.S. at 815–816, 96 S.Ct. at 1245–1246. The state must have an overriding interest in the subject matter and centralized review in a forum with special competence. *North Dixie Theatre Inc. v. McCullion*, 613 F.Supp 1339, 1345 (S.D. Ohio 1985), *United States v. Mutchler*, 559 F.2d 955 (5th Cir.1977), *Nasser v. Homewood*, 671 F.2d 432, 440 (11th Cir.1982), *ADA–Cascade*, 720 F.2d at 903. If there is adequate state court review based on predominantly local factors, federal jurisdiction may not be necessary. *Alabama Public Service Com. v. Southern R. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951). The critical inquiry, then, is whether an erroneous federal decision could impair the state's effort to implement its policy. *ADA–Cascade* at 903.

*Burford* and its progeny also indicate that there may be a further limiting factor in the application of abstention principles. The *Burford* line of abstentions rest on admittedly valid state regulatory systems rather than constitutional attacks on state law. *See e.g. Alabama Public Service Com. v. Southern R. Co.*, 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), *J.V. Peters & Co. v. Hazardous Waste Facility Approval Board*, 596 F.Supp 1556 (S.D.Ohio 1984), *Bath Memorial Hospital v. Maine Health Care Finance Com.*, 853 F.2d 1007, 1013 (1st Cir.1988). For example, in *ADA–Cascade Watch Co. v. Cascade Resource Recovery, Inc.*, 720 F.2d 897 (6th Cir.1983), plaintiff challenged the state's refusal to issue a permit for a waste disposal facility. The statutory scheme itself was not at issue, and the court abstained from interfering with a valid regulatory scheme noting that the federal court was ill equipped to review state regulations that had an entirely local effect. Likewise, *Crossridge, Inc. v. Ohio Environmental Protection Agency*, Case No. C2-88-231 (S.D.Ohio, March 1, 1988) (Graham, J.), *Browning-Ferris, Inc. v. Baltimore County*, 774 F.2d 77 (4th Cir.1985) and *J.V. Peters & Company v. Hazardous Waste Facility Approval Board*, 596 F.Supp. 1556 (S.D.Ohio 1984), cited by defendants, did not involve challenges to state regulatory schemes, but rather, the application of state law. In each instance the courts were asked to intervene in an essentially local problem where a substantial federal question was not presented. *Burford* itself involved an admittedly valid statutory scheme with the federal question being an alleged violation of due process. The State has produced no authority, nor are we aware of any, for the proposition that a federal court may properly abstain from considering a constitutional attack on a state statute that does not involve substantial questions of the application of local law.

■ We also note that the State's reliance on *Interstate Bi–Modal, Inc. v. State of Ohio*, Case No. C2-88-880 (September 1, 1988) (Graham, J.), is wholly misplaced. The State goes to great lengths to cite *Interstate Bi–Modal* as support for its

contention that questions involving the Ohio Environmental Protection Agency qualify for *Burford* type abstention. However, the State completely ignores the fact that this Court actually reached the merits of the Commerce Clause claim presented in *Interstate Bi–Modal* before abstaining on the due process claim, which involved application of state law. The Court found that it could not properly address a due process claim where the plaintiff had not pursued the administrative appeal process specifically designed to review actions of the Director of the OEPA. The distinction present in *Interstate Bi–Modal* is telling. Since the Court considered the broad constitutional challenge to the validity of the state law and refused to address its specific application even though framed in terms of a constitutional violation, we must find that a challenge to the very existence of a statutory scheme is not appropriately left to the review process established under the law itself.

Although the State admits that the Environmental Board of Review is not empowered to rule upon the constitutionality of the very statute by which it was created (Defendants' Reply, p. 8), it insists that the Court should defer to the EBR for resolution of this matter. The State cites *Canton v. Whitman,* 44 Ohio St.2d 62, 73 O.O.2d 285, 337 N.E.2d 766 (1975), and *Cincinnati ex rel Crotty v. Cincinnati,* 50 Ohio St.2d 27, 4 O.O.3d 83, 361 N.E.2d 1340 (1977) for the proposition that constitutional claims may be adequately addressed within the administrative scheme. Once again, however, the State fails to draw the distinction between a federal constitutional attack challenging a statute's validity and constitutional claims which arise from the construction of the state law. In both *Canton* and *Crotty,* the Ohio Supreme Court was called to determine if the Director's order to fluoridate public water supplies was within the police power of the

state as defined by the Ohio Constitution. An order of the Director is expressly provided for in the Act's appeal process. However, in the case at bar, we are not presented with an exercise of power pursuant to the Act, but rather, the constitutionality of the Act itself. Neither *Canton* nor *Crotty* addresses the latter issue, and neither can be construed to support federal abstention in this case.[8]

It is not disputed that the State of Ohio has a legitimate interest in the subject matter of the regulatory scheme. The disposal of solid wastes is a matter of substantial public concern. Land use questions, including the regulation of waste dumps, are of particular concern to state and local governments "and traditionally, federal courts have not interfered with state courts in the area of land use policy." *Muskegon Theatres, Inc. v. Muskegon,* 507 F.2d 199 (6th Cir.1974), *Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). Nevertheless, we find that abstention is inappropriate in this case because plaintiff claims that the Act is unconstitutional on its face and because Ohio's solid waste disposal statute does not provide a centralized forum appropriate to review the pending issues as contemplated in *Burford.*

The provisions of the Act on which the State relies to fulfill the requirements of *Burford* are limited in their scope. Section 3745.04 provides that any person who is a party to a proceeding before the director may pursue an appeal with the Environmental Board of Review. Likewise, Section 3745.06 provides that "any party *adversely affected by an order of the environmental board of review,* may appeal to the court of appeals of Franklin county...." (emphasis added). Thus, it appears to the Court that the language of the statute supports only review of actions by

---

**8.** In addition, we note that *GSX Chemical Services of Ohio, Inc. v. Shank,* EBR Case No. 181897, which is currently on appeal to the Environmental Board of Review, does not compel us to abstain from review of Section 3734.-131. *GSX* presents a challenge to the Director's choice of consent-to-jurisdiction form, and his alleged failure to provide notice and opportunity to comment on the form as required by Ohio's Administrative Procedure Act. Ohio Rev. Code § 119.01 *et seq.* The case does not present a challenge to the consent-to-jurisdiction provision of the Act itself.

the Director taken pursuant to his authority under the Act. Importantly, plaintiffs have not challenged any action of the Director which would be reviewable under these provisions, nor does it present a question concerning the construction of Ohio law. Instead, plaintiffs question the Act's compatibility with the Commerce Clause of the U.S. Constitution, an issue which the EBR has no special competence to consider.

Plaintiff attacks the solid waste disposal statute as it is written. Permitting federal court review of this kind of constitutional claim would not interfere significantly with the workings of a lawful state system, as such intervention threatened in *Burford* and *Southern Railway*. The Court is not being called upon to determine issues of state law; thus, review here would not create a parallel regulatory review institution in the federal court. The risks here are no greater than those present whenever a federal court decides whether a state regulatory statute is unconstitutional. At issue is not any fact-based agency determination, but a legislative enactment with a clear meaning not subject to modification or interpretation in the agency regulatory process. Moreover, the regulations in question do not have an entirely local effect. To the contrary, the statute has a far reaching effect on the national disposal of solid wastes, making the claims appropriate for federal review. Accordingly, the Court declines the opportunity to abstain from considering the issues presented by plaintiff.

*Commerce Clause—Section 3734.57*

By its terms, the Commerce Clause grants Congress the power "[t]o regulate Commerce ... among the several States...." Long ago it was settled that even in the absence of a congressional exercise of power, the Commerce Clause prevents the states from erecting barriers to the free flow of interstate commerce. *Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996 (1852); *see Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 370–371, 96 S.Ct. 923, 927–928, 47 L.Ed.2d 55 (1976). At the same time, however, the courts have never doubted that much state

legislation, designed to serve legitimate state interests and applied without discrimination against interstate commerce, does not violate the Commerce Clause even though it affects commerce. *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 531–532, 69 S.Ct. 657, 661–662, 93 L.Ed. 865 (1949); *see Gibbons v. Ogden*, 9 Wheat. 1, 203–206, 6 L.Ed. 23 (1824). "In areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause—where local and national powers are concurrent—the Court in the absence of congressional guidance is called upon to make the 'delicate adjustment of the conflicting state and federal claims,' *H.P. Hood & Sons, Inc. v. Du Mond, supra*, 336 U.S. at 553, 69 S.Ct. at 679 (Black, J., dissenting)...." *Great A & P Tea Co. v. Cottrell, supra*, 424 U.S. at 371, 96 S.Ct. at 928; *see Hunt v. Washington State Apple Advertising Com.*, 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977).

In this process of "delicate adjustment," the Court has employed various tests to express the distinction between permissible and impermissible impact upon interstate commerce, "but experience teaches that no single conceptual approach identifies all of the factors that may bear on a particular case." *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664 (1978). Although the Court has described its own decisions in this area as a "quagmire" of judicial responses to specific tax measures, *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 457–458, 79 S.Ct. 357, 361–362, 3 L.Ed.2d 421 (1959), the Court has steadfastly adhered to the central tenet that the Commerce Clause, "by its own force created an area of trade free from interference by the States." *Boston Stock Exchange v. State Tax Com.*, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977), *American Trucking Assoc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). One primary consequence of this constitutional restriction on state taxing powers, frequently asserted in litigation, is that "a

State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Ibid; see also Westinghouse Electric Corp. v. Tully,* 466 U.S. 388, 403, 104 S.Ct. 1856, 1865, 80 L.Ed.2d 388 (1984). The Commerce Clause even without implementing legislation by Congress is a limitation upon the states' power to tax. *Boston Stock Exchange,* 429 U.S. at 329, 97 S.Ct. at 607. For that reason, "[n]o State, consistent with the Commerce Clause, may impose a tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business." *Id.; see also Halliburton Oil Well Cementing Co. v. Reily,* 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963); *Nippert v. Richmond,* 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760 (1946); *I.M. Darnell & Son Co. v. Memphis,* 208 U.S. 113, 28 S.Ct. 247, 52 L.Ed. 413 (1908); *Guy v. Baltimore,* 100 U.S. 434, 25 L.Ed. 743 (1880).

The Court must consider the issue of discrimination against interstate commerce raised in this case in light of the balance that must be maintained between the purpose of the Commerce Clause, to foster the free exchange of trade among the several states, and the "legitimate interest of the individual States in exercising their taxing powers...." *Boston Stock Exchange,* 429 U.S. at 329, 97 S.Ct. at 329. We note that this balancing of interests requires careful analysis of the facts of each individual case.

> [T]he delicate balancing of the national interest in free and open trade and a State's interest in exercising its taxing powers requires a case-by-case analysis and such analysis has left much room for controversy and confusion and little in the way of precise guidelines to the States in the exercise of their indispensable power of taxation.

*Westinghouse Electric Corp. v. Tully,* 466 U.S. 388, 403, 104 S.Ct. 1856, 1865, 80 L.Ed.2d 388 (1984) (citation omitted). Thus, every commerce clause challenge turns upon the specific facts presented.

■ The Court also notes the distinction established by the Supreme Court be-

tween "protectionist" measures employed by states to favor local commerce and measures employed by states to safeguard the health and safety of their people. While the latter may be upheld if treatment of intrastate and interstate commerce is evenhanded and if effects on interstate commerce are only incidental, the former are subject to a "virtually per se rule of invalidity." *Philadelphia v. New Jersey,* 437 U.S. 617, 623–624, 98 S.Ct. 2531, 2535–2536, 57 L.Ed.2d 475 (1978) (striking down a New Jersey statute prohibiting importation of solid wastes originating outside of the state). *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471–472, 101 S.Ct. 715, 727–728, 66 L.Ed.2d 659 (1981) (upholding Minnesota statute banning retail sale of milk in plastic non-returnable containers); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) ("Where the statute regulates *even-handedly* to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.") (emphasis added). "The critical inquiry, therefore, must be directed to determining whether [the Act] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. New Jersey,* 437 U.S. at 624, 98 S.Ct. at 2536 (1978).

■ Understandably, the State's argument proceeds on the basis that the Ohio law is an exercise of the state's police power designed to preserve Ohio's resources and its environment. Therefore, the State asserts, the relevant inquiry is whether the local interest outweighs the burdens on interstate commerce. The State fails to acknowledge, however, that the Court does not engage in this type of balancing test if the legislation in question does not apply even-handedly to both intrastate and interstate commerce, unless the State offers a compelling reason for the disparate treatment. Once the Court ascertains that the statute treats intrastate

commerce and interstate commerce differently and that there is no compelling reason for the distinction, the actual burden it imposes on interstate commerce is not relevant. The statute violates the Commerce Clause.[9]

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), and *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), both cited by the State, illustrate the point. In *Pike*, an Arizona statute required that all fruit growers in the state package their fruit in approved containers before shipping it out of the state. A cantaloupe grower in Parker, Arizona who sent his fruit to a packing plant it owned in California challenged the statute. The Court engaged in a balancing of the local interest against the burden on interstate commerce only after noting that the statute applied even-handedly to both interstate and intrastate commerce. In *Maine*, the state banned entirely the importation of live fishbait. The Court found that the legislation passed constitutional muster even though it did not apply even-handedly. The state had a compelling reason to discriminate against interstate commerce—there were substantial uncertainties surrounding the effects that fishbait parasites and non-native species would have on the wild fish population of Maine. Thus, the Court properly engaged in the balancing approach. These two cases illustrate when it is appropriate to engage in a balancing of interests—when the statute in question applies equally to interstate and intrastate commerce, or when the statute discriminates against interstate commerce but for a compelling reason.

To the contrary, the Court has taught that when the state discriminates against interstate commerce without a compelling reason to do so, the legislation is unconstitutional regardless of how slight the burden is on interstate commerce or how legitimate the state interest. For example, in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the Supreme Court invalidated Hawaii's excise tax on sales of wholesale liquor that exempted several kinds of locally produced wines and spirits. Hawaii defended the facially discriminatory exemptions by arguing that they were a reasonable means of promoting the consumption of liquors made from indigenous Hawaiian plants. The Court rejected the State's justification for the discriminatory exemption and held that it is a "cardinal rule" that "[n]o State, consistent with the Commerce Clause, 'may impose a tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business.'" *Bacchus* at 268, 104 S.Ct. at 3053 (quoting *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 329, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977)). The means chosen to promote the consumption of Hawaiian liquor—levying a tax on out-of-state competitors—violated the primary function of the Commerce Clause of forbidding such preferential treatment. *See also Maryland v. Louisiana*, 451 U.S. 725, 101

---

**9.** In its Responsive Memorandum Regarding the December 27, 1990 decision in *Government Suppliers Consolidating Services, Inc. v. Bayh*, 753 F.Supp. 739 (S.D.1990) (See discussion at pg. 261, *infra*, n. 11, the State again argues that the Court must engage in a three prong standard of review which contemplates the purpose of the legislation, its effectiveness, and its reasonableness. This inquiry, however, is not applicable when the statute in question is discriminatory on its face. The courts have repeatedly prefaced further inquiry on the evenhanded application of the legislation. *See e.g., Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 371–372, 96 S.Ct. 923, 927–928, 47 L.Ed.2d 55 (1976); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 443, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). *Bill Kettlewell Excavating, Inc. v. Michigan Department of Natural Resources, Co.*, 732

F.Supp. 761 (E.D.Mich.1990) and *County of Washington v. Casella Waste Management Inc.*, Case No. 90–DU–513 (N.D.N.Y.1990), 1990 WL 208709 1990 U.S.Dist. LEXIS 16941 (December 6, 1990), cited by the State, are in accord. In both cases the courts found that the challenged legislation treated in-state and out-of-state waste equally thus meriting continued analysis. The State notes in its memorandum that both cases involved legislation that was applied equally to in-state and out-of-state commerce products but refuses to acknowledge that it was for that reason alone that the courts continued their commerce clause analysis. As we discuss above, Section 3734.57 discriminates against out-of-state waste on its face; therefore we need not inquire into the effectiveness or reasonableness of the legislation.

S.Ct. 2114, 68 L.Ed.2d 576 (1981) (invalidating Louisiana's "first-use" tax on natural gas because in-state users were favored by a series of exemptions and credits); *Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977) (invalidating a New York stock transfer tax scheme because it reduced the tax payable by non-residents when the transfer involved an in-state sale, and also set a maximum limit to the tax payable on an in-state, but not an out-of-state, sale).

Perhaps more to the point is the Court's discussion in *Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). In *Philadelphia,* the appellants challenged a New Jersey statute which banned entirely the importation of solid wastes into the state. In striking down the statute as unconstitutional, the Court did not engage in a balancing test as the statute was discriminatory on its face and the State failed to prove a compelling need for distinguishing between in-state and out-of-state waste.[10] It did not matter that the ultimate aim of the statute was to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution. *Id.* at 626, 98 S.Ct. at 2536. Whatever the ultimate purpose of the statute, the state could not accomplish its goals by discriminating against commerce coming from outside the state absent some reason, "apart from their origin," to treat them differently. *Id.* at 627, 98 S.Ct. at 2537. Both on its face and in its application, the legislation violated the principle of nondiscrimination. The Court went on to say,

The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. [511] at 522–524 [55 S.Ct. 497, 500–501, 79 L.Ed. 1032 (1935)]; or to create jobs by keeping industry within the State, *Foster Fountain Packing Co. v. Haydel,* 278 U.S. 1, 10 [49 S.Ct. 1, 3, 73 L.Ed. 147 (1928)]; *Johnson v. Haydel,* 278 U.S. 16 [49 S.Ct. 6, 73 L.Ed. 155 (1928)]; *Toomer v. Witsell,* 334 U.S. [385] at 403–404 [68 S.Ct. 1156, 1165–1166, 92 L.Ed. 1460 (1948)]; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, *Edwards v. California,* 314 U.S. 160, 173–174 [62 S.Ct. 164, 166–167, 86 L.Ed. 119 (1941)]. In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy.

*Philadelphia* 437 U.S. at 627, 98 S.Ct. at 2537.

To resolve the pending motion, the Court must determine if the Act treats interstate and intrastate commerce evenhandedly and if not, whether the state has articulated a compelling reason for distinguishing in-state wastes from out-of-state wastes. In either instance, the Court may engage in a balance of the state's interests with the burdens the legislation places on interstate commerce. If, however, the Court finds that the statute discriminates against out-of-state wastes without a compelling need to do so, we must find that it is incompatible with the Commerce Clause and strike it down.[11]

---

**10.** In *Philadelphia,* the State of New Jersey actually conceded that there was no basis to distinguish out-of-state waste from domestic waste. Defendants cite this fact as the distinguishing feature between *Philadelphia* and the case at bar, arguing that Ohio does have a basis for distinguishing among various wastes. However, as we discuss *infra,* the State has failed to show the need to distinguish between in-state and out-of-state wastes.

We also are compelled to note that we may not, as the State suggests, declare *Philadelphia* to be to the Commerce Clause what *Dred Scott* is to the Equal Protection clause and ignore it

altogether. This Court is strictly bound by relevant Supreme Court precedent and we are without authority to find it invalid.

**11.** Recently, the United States District Court for the Southern District of Indiana addressed a similar constitutional challenge as the case at bar. In *Government Suppliers Consolidating Services v. Bayh,* 753 F.Supp. 739 (S.D.1990), the court struck down an Indiana statute which placed onerous burdens on the interstate shipment of solid wastes into Indiana. The statute imposed a "tipping fee" on out-of-state wastes that was greater than that imposed on in-state

It is uncontroverted the provisions of Ohio Rev.Code § 3734.57(A) and (B) treat in-state wastes differently than out-of-state wastes. Under Section (A), the tax levied on wastes imported into the State is as much as one dollar ($1.00) more per ton than that placed on in-district wastes. The fee is not discretionary, nor is it based on any factors other than the wastes' place of origin. Likewise, Section (B) authorizes the individual management districts to impose disparate fees. Although the choice to actually impose the Section (B) taxes is left to the discretion of the management districts, if they are levied, "fees levied under division (B)(1) of this section shall always be equal to one-half of the fees levied under division (B)(2) of this section, and fees levied under division (B)(3), which *shall be in addition to fees levied under division (B)(2) of this section, shall always be equal to fees levied under division (B)(1) of this section.*" (Emphasis added.) In other words, the tax on out-of-state wastes is required to be three times that imposed on in-district wastes.

■ The fact that the Act discriminates on its face requires us to determine if the State of Ohio has articulated a compelling reason for distinguishing in-state and out-of-state wastes. Furthermore, we must consider the reasons proffered by the State in light of the careful review that is historically applied to taxes. Since the power to tax presents a more imposing threat to the exchange of commerce than a state's use of its police power, taxes are subject to exacting scrutiny and are deemed unconstitutional when they ebb the free flow of interstate commerce. *Freeman v. Hewit*, 329

U.S. 249, 253, 67 S.Ct. 274, 277, 91 L.Ed. 265 (1946), *Tyler Pipe Industries, Inc. v. Washington State Dep't. of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).

The State offers three reasons for the need to tax out-of-state wastes at a higher rate. First, it cites the ever-increasing amount of solid wastes that are being shipped into Ohio. In 1988 alone, according to defendants, over two billion tons of out-of-state waste was disposed of in Ohio—approximately 18% of the total amount of waste processed in the state. The sheer volume of waste flowing into the state, it asserts, is sufficient in and of itself to tax out-of-state wastes at a higher rate. Second, the State claims that foreign wastes present unique regulatory problems. Unlike wastes generated in the state, foreign wastes cannot be inspected at their point of origin. This allegedly presents financial and logistical problems. The source of the waste and its composition is more difficult and expensive to ascertain at the place of disposal. Finally, the State argues that the increased threat of hazardous waste materials entering Ohio requires the imposition of higher fees. None of these reasons offered by the State is sufficient to justify the distinction between domestic and foreign wastes and require the Court to engage in a balancing of the state's interests with the actual burden the Act places on interstate commerce.

■ A state may not provide its own citizens a preferred right of access over consumers in other states to the natural resources located within its borders. *Phil-*

wastes; required certification that the wastes were not hazardous; and required disclosure of the point of the waste's generation. In striking down the statute, the Indiana court adopted substantially the same reasoning we do here, although rather than requiring the State to come forth with a compelling reason for the facially discriminatory taxing scheme, the court accepted the State's assertion that the provisions were justified as a means to protect the health and welfare of its citizens. The court, however, found that there were less drastic means of achieving that goal and struck down the statute.

Our analysis differs in that we believe that *Pike, Tyler, Bacchus,* and *Maryland v. Louisiana,*

discussed above, do not support the notion that anything less than a compelling reason may justify a facially discriminatory taxing scheme. We decline to engage in an analysis which requires us to accept the State of Ohio's asserted reasons for distinguishing between in-state and out-of-state tax rates and then search for less drastic means to validate those reasons. Nonetheless, the *Bayh* decision supports our finding here. Its thrust is that absent a showing of inherent differences between in-state and out-of-state wastes, discriminatory treatment of the latter is violative of the Commerce Clause.

*adelphia,* 437 U.S. at 627, 98 S.Ct. at 2537, *West v. Kansas Natural Gas Co.,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923). The Supreme Court has consistently held that a state cannot prevent articles of trade from being shipped in interstate commerce on the basis that local demands require a state to use its resources to the exclusion of other states. *Foster–Fountain Packing Co. v. Haydel,* 278 U.S. 1, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147 (1928). Thus, it appears that despite concerns over the decreasing amount of dump space, the State may not, consistent with the constitution, refuse shippers of wastes access to Ohio's landfills and waste treatment facilities. The Supreme Court has expressly held that a state's legitimate desire to protect its environment may not be accomplished by discriminating against materials from outside the state unless there is some reason, "apart from their origin, to treat them differently." *Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2536 (1978).

The State's claim that the allegedly higher costs of inspecting out-of-state wastes requires it to treat domestic and foreign wastes differently is without support. The Court does not question the validity of state taxing schemes which place higher fees on foreign articles when the state incurs additional administrative costs in inspecting articles located outside the state. In fact, it appears that the Supreme Court has only found such fees invalid when they explicitly exempt local activities from the obligations imposed on comparable interstate enterprises. For example, in *Hale v. Bimco Trading, Inc.,* 306 U.S. 375, 59 S.Ct. 526, 83 L.Ed. 771 (1939), the Court held unconstitutional a Florida statute which imposed an inspection fee 60 times the actual cost of inspection upon cement imported into the state, because the statute exempted locally produced cement from all inspection and inspection fees. Absent extreme situations such as in *Hale,* inspection fees are valid. The question, then, is whether Ohio's tax is to raise revenue or to reimburse the State for the costs of inspecting in-state and out-of-state waste.

The purpose of Section 3734.57 is definitively expressed in the section.[12] It goes to great length to describe in detail the nature of the taxing scheme and for what activities the State may generate revenue. Pri-

**12.** The section reads, in pertinent parts:

(A) For the purposes of paying the state's long-term operation costs or matching share for actions taken under the "Comprehensive Environmental Response, Compensation, and Liability Act of 1980," 94 Stat. 2767, 42 U.S.C. § 9601 et seq., as amended; paying the costs of measures for proper cleanup of sites where polychlorinated biphenyls and substances, equipment, and devices containing or contaminated with polychlorinated biphenyls have been stored or disposed of; paying the costs of conducting surveys or investigations of solid waste facilities or other locations where it is believed that significant quantities of hazardous waste were disposed of and for conducting enforcement actions arising from the findings of such surveys or investigation; and for paying the costs of acquiring and cleaning up, or providing financial assistance for cleaning up, any hazardous waste facility or solid waste facility containing significant quantities of hazardous waste, that constitutes an imminent and substantial threat to public health or safety or the environment....

(B) For the purpose of preparing, revising and implementing the solid waste management plans of county and joint solid waste management districts, including, without limitation, the development and implementation of solid waste recycling or reduction programs; providing financial assistance to boards of health within the district in which solid waste facilities are located for the enforcement of sections 3734.01 and 3734.13 of the Revised Code and rules adopted and orders and terms and conditions of permits, licenses, and variances issued under those sections; providing financial assistance to the county to defray the added costs of maintaining roads and other public facilities and of providing emergency and other public services resulting from the location and operation of a solid waste facility within the county under the district's approved solid waste management plan; paying the costs incurred by boards of health for collecting and analyzing water samples from public or private wells on lands adjacent to solid waste facilities that are contained in the approved or amended plans of county or joint districts; and paying the costs of developing and implementing a program for the inspection of solid wastes generated outside the boundaries of this state that are disposed of at solid waste facilities included in the district's approved solid waste management plan or amended plan, the solid waste management policy committee of a county or joint solid waste management district may levy fees....

marily, the section is concerned with raising money to offset the State's obligations under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. To that extent, the State is authorized to tax activities related to the proper clean up of wastes. Importantly, Section (A) makes no reference to the costs of inspecting wastes that are generated either inside or outside the state. Section (B) authorizes the taxing of wastes for basically the same purposes although it does make reference to the inspection of foreign wastes. The individual management districts may levy fees to pay the costs of "developing and implementing" a program for inspecting out-of-state wastes.

A careful reading of the statute indicates that it is not designed to be a scheme for the inspection of waste. It is a piece of legislation geared toward raising revenue to offset the state's cost of cleaning up its landfills and disposal facilities. Therefore, we cannot lend any credence to the State's proposition that the disparity of fees is warranted by the alleged higher costs of inspecting out-of-state wastes. The challenged section is exhaustive in defining its purpose. It is designed primarily to raise revenue, not to reimburse the State for the costs of inspecting waste. Moreover, other provisions of the Act specifically deal with waste inspection.[13] We express no opinion as to those provisions; however, the State of Ohio has not endeavored to implement such legislation within the structure of Section 3437.57 and we are without authority to read into a statute provisions which the State has conspicuously omitted.

Even if we were to read the statute as authorizing fees commensurate with the costs of inspection, the State has not produced any evidence whatsoever that the cost of inspecting out-of-state wastes is significantly higher than the inspection of domestic wastes. The affidavits on which the state relies only illustrate the potential difficulties in evaluating waste materials from unknown sources. They provide no data which shows that the inspection of out-of-state wastes costs up to 300% more than the inspection of in-state wastes. Even given the latitude which the Court must accord the opposing party in a motion for summary judgment, there is not a modicum of evidence to suggest that inspection costs justify the great disparity in the taxing scheme.

The State's third articulated reason for the discriminatory treatment of out-of-state wastes is the difficulty in policing the transportation of hazardous wastes. The State cites an incident in which it is believed that hazardous materials were illegally shipped into the state and caused an explosion, as well as other problems, in enforcing criminal restrictions for the transportation of hazardous materials. The Court appreciates the need to insure the safe disposal of waste materials, but the State's arguments have little to do with the statute in question. Section 3734.57 is purely a revenue raising provision, and the State has not articulated any connection between policing hazardous wastes and taxing wastes differently on the single basis of their place of origin.

The State has not provided any acceptable reasons or theories for treating in-state wastes differently from out-of-state wastes. Although the State raises numerous legitimate concerns other than those discussed above, they are largely irrelevant. We deal here only with the narrow issue of whether the discriminatory surcharges on out-of-state wastes impose constitutionally impermissible burdens on interstate commerce. The plain unambiguous language of the statute supports only the conclusion that the State is distinguishing between wastes based solely on their place of origin and placing excessively high premiums on out-of-state wastes. Since Ohio has demonstrated no compelling need to impose substantially higher taxes on out-of-state wastes than in-state wastes, the Court cannot engage in a balancing of in-

---

**13.** Ohio Rev.Code §§ 3734.04 and 3734.07 each provide for the inspection of solid wastes into the state. Neither requires out-of-state carriers to pay the costs of inspection in most cases. However, the justification for any such fees are more appropriately argued with respect to those sections.

terests; the actual burden the provision has on commerce is not relevant.

Ohio Rev.Code § 3734.57 is a transparent attempt to discourage the shipment of solid wastes into Ohio. On its face, it discriminates against interstate commerce in violation of the constitution's proscription of such burdens. The State cannot solve its waste problems by blocking or rerouting the market's allocation of that waste, for the Commerce Clause can have no tolerance for parochial decisions "by one State to isolate itself in the stream of interstate commerce from a problem shared by all." *Philadelphia*, 437 U.S. at 629, 98 S.Ct. at 2538. "The peoples of the several states must sink or swim together, even in their collective garbage." TRIBE, *American Constitutional Law*, 2nd Ed., § 6–8 (1988) (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935)). Accordingly, plaintiff's motion for summary judgment is hereby GRANTED as to Ohio Rev.Code § 3734.57.

### *Commerce Clause—Section 3734.131*

■■■ On February 1, 1991, the State filed a Motion to Dismiss plaintiff's challenge to Section 3734.131 on the basis of legislative amendments to the Section. After carefully reviewing the changes in the consent to service provisions, we find that although some portions of the challenged statute have been altered, those changes were minimal. The State merely reduced the time frame in which the consent-to-jurisdiction form must be filed from seven to three days before the shipment of waste into the state and discarded annual filing in favor of requiring consent to be filed every four years. Therefore, the alleged offending aspects of the legislation remain, making review of the parties' motions for summary judgment appropriate.

■■■ The consent to service provisions of Section 3734.131 present similar constitutional concerns as do the provisions of Section 3734.57. When the burden a state regulation places on interstate commerce ebbs its flow in a manner not applicable to local commerce, the local interests must yield to the greater federal interest in maintaining a free and open market among the several states. The consent provisions may either constitute discrimination that renders the regulation invalid without more, or requires us to weigh and evaluate the State's putative interest against the interstate restraints in order to determine if the burden imposed is a reasonable one. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *Brown—Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 578–579, 106 S.Ct. 2080, 2083–2084, 90 L.Ed.2d 552 (1986). After reviewing the pleadings and affidavits in a light most favorable to the State, we find that the burden imposed on interstate commerce by the consent to service statute exceeds any local interest the State may advance.

The Ohio statute before us may be held to discriminate impermissibly against interstate commerce without extended inquiry. It plainly draws a distinction between intrastate and interstate commerce and places impediments only on the latter. We reject the State's contention that the statute actually strives to achieve equality among all transporters of waste. It suggests that the provision is non-discriminatory because it compels entities who are not subject to the State's jurisdiction to consent to service of process in order to place them on par with persons who are already able to be served. It is simplistic to suggest that because the statute would lessen the burden on the State of serving carriers of waste that the statute treats in-state and out-of-state carriers equally. The State can no more justify the distinction between in-state and out-of-state carriers than it can domestic and foreign wastes. Thus, we may strike down the statute without further inquiry. *Brown–Forman*, at 579, 106 S.Ct. at 2084.

We proceed, however, to assess the interests of the State to demonstrate that its legitimate sphere of regulation is not much advanced by the statute while interstate commerce is subject to substantial restraints. As written, the statute seeks to secure service of process over those persons engaged in the interstate transporta-

tion of waste who transact business in the state or cause harm there. It reads, in pertinent parts:

(A)(1) ... no person shall transport or cause to be transported from outside this state to a solid waste facility, infectious waste treatment facility, or hazardous waste facility in this state any solid wastes, infectious wastes, or hazardous waste unless each of the following persons has first irrevocably consented in writing to the jurisdiction of the courts of this state and service of process in this state, including, without limitation, summonses and subpoenas, for *any civil or criminal proceeding arising out of or relating to the waste that is shipped to a facility in this state:*

(a) The person who actually transports the waste;

(b) The business concern that employs the person described in division (A)(1)(a) of this section;

(c) The person or persons who have contracted with the transporter for transportation of the waste to a facility in this state;

(d) The person or persons who have contracted with the owner or operator of the facility for treatment, transfer, storage, or disposal of the waste at the facility in this state.

(2) The original of the consent-to-jurisdiction document shall be legible and shall be filed with the director of environmental protection on a form provided by the director. A legible copy of the completed document shall be filed with the owner or operator of each solid waste facility, infectious waste treatment facility, or hazardous waste facility to which the waste is transported. The original and each copy shall be sent by certified mail, return receipt requested, at least three days before the first shipment of solid wastes, infectious wastes or hazardous waste into this state.

(3) All consent-to-jurisdiction documents required under division (A)(1) or (2) of this section shall be refiled during the month of December, 1995 and during the month of December of every fourth year thereafter. Except as provided in division (D)(1) of this section, after December 31, 1995 or after the thirty-first day of December of every fourth year thereafter, whichever is applicable, no person identified in division (A)(1)(a) to (d) of this section shall continue to transport or cause to be transported any solid wastes, infectious wastes, or hazardous waste from outside this state to a solid waste facility, infectious waste treatment facility, or hazardous waste facility in this state unless the person refiles with the director and the owner or operator of each facility to which the waste is transported consent-to-jurisdiction documents, in the manner prescribed in division (A)(2) of this section, during the month of December next preceding the period for which the refiled document is required.

. . . .

(B) A person who enters this state pursuant to a summons, subpoena, or other form of process authorized by this section is not subject to arrest or the service of process, whether civil or criminal, in connection with other matters that arose before his entrance into this state pursuant to the summons, subpoena, or other form of process authorized by this section.

Ohio Rev.Code § 3734.131 (emphasis added). We hasten to note that Ohio's long-arm statute would authorize service over the same persons and in the same circumstances as does § 3734.131; [14] therefore the

14. The Ohio long-arm statute, R.C. § 2307.381 provides, in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person;
(1) Transacting any business in this state;
(2) Contracting to supply services or goods in this state;

(3) Causing tortious injury by an act or omission in this state;
(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state....

consent provisions would appear to be unnecessary. If the State believes that additional record keeping is desirable to readily identify waste disposers who may violate Ohio waste disposal laws and to insure that they are amenable to service of process, it is free to require waste disposers to maintain records of the business addresses of waste generater-disposers and records regarding their waste hauled to Ohio landfills. But such record-keeping requirements must apply alike to in-state and out-of-state waste disposers. As it stands, however, § 3734.131 does not treat all waste disposers equally, nor does it expand the scope of Ohio's long-arm jurisdiction or otherwise purport to provide the State with any other benefit or interest.

The consent provisions do, however, place burdens on interstate commerce. Many members of the NSWMA and others affected by § 3734.131 have no office in Ohio, are not registered to do business there, and have no agent appointed to accept service of process in the state. Nevertheless, in order to pursue their trade, every person linked to the transportation of solid wastes must consent to the jurisdiction of the Ohio courts by filing with the State before transporting waste across the state line.

We do not question that the State has a legitimate interest in facilitating service of process on foreign carriers. "The ability to execute service of process on foreign corporations and entities is an important factor to consider in assessing the local interest in subjecting out-of-state entities to requirements more onerous than those imposed on domestic parties." *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.,* 486 U.S. 888, 108 S.Ct. 2218, 2222, 100 L.Ed.2d 896 (1988). It is true that serving foreign defendants may be more arduous than serving domestic persons; nevertheless, state interests are insufficient to withstand Commerce Clause scrutiny when they reach beyond what is necessary to meet their needs. Ohio already has a statutory scheme which is sufficient to meet its needs of securing service of process over those engaged in the interstate shipment of solid waste; thus, it has no need for the consent provisions. The consent to service provisions merely place arduous and unnecessary burdens on those who ship solid waste into Ohio.

Ohio cannot justify its statute as a means of protecting its residents and environment from illegal management of waste disposal by subjecting foreign carriers and others to the extreme provisions of § 3734.131. Ohio's long-arm statute is adequate to reach those persons who are properly and constitutionally amenable to suit. The State may not bottleneck interstate commerce by imposing strenuous filing burdens over any participant in the solid waste disposal arena. Accordingly, we find that Ohio Rev.Code § 3734.131 discriminates against and places undue burdens on interstate commerce in violation of Article I, Section 8 of the U.S. Constitution.

Defendant's Motion to Dismiss plaintiff's challenge to Section 3734.131 is DENIED. Defendant's Motion to Strike plaintiff's reply to defendant's responsive memorandum regarding the *Government Suppliers* decision is hereby GRANTED. Plaintiff's motion for summary judgment is hereby GRANTED. Defendant's cross-motion for summary judgment is hereby DENIED. The Clerk of Courts shall enter JUDGMENT for the plaintiff.

---

The Ohio long-arm statute has been interpreted to extend its courts' jurisdiction to the constitutional limits of due process, at least with respect to the "transacting any business" provision of the statute. *In–Flight Devices Corp. v. VanDusen Air, Inc.,* 466 F.2d 220, 225 (6th Cir.1972). *Cf., Ohio State Tie & Timber, Inc. v. Paris Lumber Co.,* 8 Ohio App.3d 236, 238, 456 N.E.2d 1309 (1982); *Gold Circle Stores v. Chemical Bank,* 4 Ohio App.3d 10, 14, 446 N.E.2d 194 (1982).

If the question is the identity and residence of waste disposal law violators, then Ohio is free to draft a provision which requires such records to be maintained by all waste disposers or waste haulers.