**INDUSTRIAL MAINTENANCE SERVICE, INC., a West Virginia corporation, Plaintiff,**

v.

**Arch A. MOORE, Jr., Governor of the State of West Virginia; The West Virginia Department of Natural Resources; Ronald R. Potesta, Director of the West Virginia Department of Natural Resources, Defendants.**

Civ. A. No. 2:87–0465.

United States District Court, S.D. West Virginia, Charleston Division.

June 8, 1987.

Arden J. Curry, Arden J. Curry, II, Charleston, W.Va., for plaintiff.

Jennifer J. Costello, Asst. Atty. Gen., Charleston, W.Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the request of the plaintiff for a permanent injunction enjoining the enforcement by defendants of Executive Order No. 6–87, which, *inter alia*, prohibits the importation of solid waste into West Virginia for disposal.[1]

The plaintiff operates a solid waste landfill in Harrison County, West Virginia. As a regular part of its business, the plaintiff accepts asbestos for disposal. Except for asbestos, all solid waste disposed of by plaintiff is generated within the State of

1. The text of Executive Order No. 6–87 reads in its entirety as follows:

WHEREAS, West Virginia State Government has the responsibility under the law to establish a comprehensive program of controlling solid waste, its proper control and disposal; and,

WHEREAS, the inadequate or improper control of solid waste collection, transportation, processing and disposal, particularly solid waste of unknown origins from without the State of West Virginia, can cause harm to the citizens of the State and to the quality of the environments, especially when the contents of such waste are not capable of being identified; and,

WHEREAS, unsatisfactory regulation of the more than sixty solid waste facilities in the State will have adverse economic, social and cultural effects on the people, businesses and communities of the State of West Virginia; and,

WHEREAS, the particular needs of the local citizens and business entities must be met before consideration is given to solid waste disposal from identities located without the State of West Virginia in order to satisfy public health, safety and welfare considerations; and,

WHEREAS, the West Virginia Department of Natural Resources is the State agency with the primary responsibility to enforce the law in this regard and possesses the required powers, duties and authority to achieve this important task.

NOW, THEREFORE, I, Arch A. Moore, Jr., Governor of the State of West Virginia, pursuant to and by virtue of the authority vested in me by the laws and Constitution of the State of West Virginia, do hereby DIRECT the West Virginia Department of Natural Resources:

1. To closely monitor the existing solid waste facilities in West Virginia.

2. To require the facilities to meet the standards delineated in the rules and regulations which are promulgated under the Solid Waste Management Act.

3. To make certain that the solid waste requirements of the local area are given the foremost priority in the operation of such solid waste facilities, all for the benefit of the health and welfare of the public at large.

4. To take necessary action to inspect and investigate solid waste facilities and undertake corrective actions where violations are discovered.

5. To review every new application for a license and applications to re-new a license of any existing solid waste facility that is engaged or plans to be engaged in receiving any such solid waste from without the State of West Virginia, for, among other reasons, consideration to the ability or inability of the State of West Virginia to provide the resources necessary to adequately monitor the contents of such solid waste, all for the benefit of the health and safety and peace of mind of the citizens of the State of West Virginia.

6. The Department of Natural Resources is by this Executive Order without authority to confirm, license, re-new a license and in any manner whatsoever encourage the disposition by a licensee of solid waste other than that generated by the citizens of West Virginia by their individual acts, either privately or in support of our own economics.

This order shall remain in full force and effect until rescinded by Executive Order.

438

West Virginia.[2]  In 1986, the plaintiff's gross revenues for the disposal of solid waste were approximately $189,000. Of this amount, approximately $92,000 was attributable to the disposal of asbestos. Approximately 80% of the $92,000 was generated from the disposal of asbestos with origins outside West Virginia. The percentage of revenue attributable to out-of-state asbestos during 1986 continued at the same rate during the first several months of 1987. Executive Order No. 6–87 was entered on April 24, 1987.[3] The parties agree that there is no reason to believe that the asbestos disposed of by the plaintiff which is generated outside the borders of the State is dissimilar in nature to that which is generated within the State and also disposed of by plaintiff.

The plaintiff maintains that the executive order violates the Commerce Clause. The defendants not only dispute this claim but also contend that this court should abstain from consideration of the merits of this action under both the *Pullman* doctrine and the *Burford* doctrine.

### Findings of Fact

The court adopts the findings of fact as stipulated and set forth in the order entered in this matter on June 1, 1987. In addition, further findings are based upon the uncontroverted evidence presented at a hearing held on June 2, 1987. Hence the court further finds that:

1. The enforcement of Executive Order No. 6–87 would irreparably harm the plaintiff in that it would deprive the plaintiff of a substantial source of income.

2. A potential claim before the Court of Claims of West Virginia does not protect the plaintiff from irreparable harm in that an award by that court is not binding upon the State but must be approved and implemented by the State Legislature. Further, plaintiff would, in any event, likely incur substantial legal fees and costs in seeking such an award and be significantly delayed in obtaining redress.

3. Neither the West Virginia Department of Natural Resources nor any other instrumentality of the State of West Virginia routinely inspects solid waste generated within or without the State of West Virginia.

4. In-state solid waste is inspected at its site of origin only when suspicious circumstances become known to the West Virginia Department of Natural Resources. Approximately fifteen to twenty inspections of in-state solid waste at its point of origin are conducted annually.

5. But for a claimed lack of resources, the West Virginia Department of Natural Resources could inspect both asbestos originating within the State of West Virginia and asbestos originating outside its boundaries at the site of the landfill.

### Conclusions of Law

I.  Abstention

In *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a railroad company challenged a regulation promulgated by the Railroad Commission requiring that sleeping cars be continually manned by an employee having the rank of conductor. At that time, all conductors in Texas were white, but porters were exclusively black. The statute was challenged under a state statute prohibiting discrimination by the Commission and under the Equal Protection Clause of the United States Constitution. A three-judge panel of the district court enjoined enforcement of the regulation, holding that the regulation violated the Equal Protection Clause of the United States Constitution. On appeal, the Supreme Court reversed and remanded the case to the district court with directions to abstain pending a determination of the ap-

2. Counsel for the parties have informally advised the court of their agreement to this fact, which is also supported by representations made at the hearing for a temporary restraining order and testimony of the plaintiff's principal, Kenneth Riffle.

3. On May 13, 1987, enforcement of the order was temporarily restrained by this court. By agreement of the parties, the temporary restraining order is effective through this date.

plication of the relevant state statute in state court. *Id.*

The *Pullman* Court reasoned that:

The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open. Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy. It is therefore our duty to turn to a consideration of questions under Texas law.

The Commission found justification for its order in a Texas statute which we quote in the margin. It is common ground that if the order is within the Commission's authority its subject matter must be included in the Commission's power to prevent "unjust discrimination ... and to prevent any and all other abuses" in the conduct of railroads. Whether arrangements pertaining to the staffs of Pullman cars are covered by the Texas concept of "discrimination" is far from clear. What practices of the railroads may be deemed to be "abuses" subject to the Commission's correction is equally doubtful. Reading the Texas statutes and the Texas decisions as outsiders without special competence in Texas law, we would have little confidence in our independent judgment regarding the application of that law to the present situation.

*Id.* at 498–99, 61 S.Ct. at 644 (footnote omitted).

The *Pullman* doctrine is only applicable where an interpretation by a state court of an ambiguous state law may render a federal constitutional issue moot. *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). Here, there is no applicable state law or regulation governing the transportation of solid waste located outside of the boundaries of West Virginia. Moreover, the effect of the executive order is clear on its face. Under these circumstances, abstention pursuant to the *Pullman* doctrine is clearly unwarranted in the present action. *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

The Supreme Court recognized a distinct doctrine of abstention in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In *Burford,* Sun Oil Company attacked in federal court the validity of an order by the Texas Railroad Commission granting Burford a permit to drill four wells on a small plot of land in a Texas oil field. Sun Oil challenged the grant under a state regulatory scheme and under the Due Process Clause of the United States Constitution. Under the state regulatory scheme, the Railroad Commission was charged with allocating drill permits among owners of property based on the amount of mobile oil likely to be under a certain tract of land for the life of the proposed drill. The decisions of the Railroad Commission were reviewable exclusively in the district courts of Travis County, Texas. The federal district court abstained, directing that the controversy be tried initially before the Travis County district court. The circuit court reversed, holding that the district court should have considered the constitutional challenge. On appeal, the Supreme Court reversed, asserting that abstention by the district court had been proper. *Id.*

The *Burford* court noted that the Railroad Commission and the district courts in Travis County had special expertise in applying the complex regulatory scheme and that federal litigation in the area would inevitably lead to confusion. *Id.* at 326–27, 63 S.Ct. at 1103–04. Further, the regulatory scheme addressed an industry of vital importance to the State of Texas. *Id.* at 332, 63 S.Ct. at 1106. In concluding that abstention was mandated, the Court stated:

The State provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state

policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. Cf. *Matthews v. Rodgers*, 284 U.S. 521 [52 S.Ct. 217, 76 L.Ed. 447]. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand.

*Id.* at 333–34, 63 S.Ct. at 1107.

The Fourth Circuit recently interpreted the scope of the *Burford* doctrine in *Browning-Ferris, Inc. v. Baltimore County*, 774 F.2d 77 (4th Cir.1985). In *Browning-Ferris*, an action in federal court was brought, alleging constitutional violations resulting from denial of state and county permits necessary to operate a sanitary landfill. The State argued that the permit was refused because Browning-Ferris had violated conditions in its previous permit. The district court abstained based on the *Burford* doctrine and the Fourth Circuit affirmed.

The Fourth Circuit posited that "The purpose of *Burford* abstention is to prevent a federal court from interfering with a 'complex state regulatory scheme concerning important matters of state policy for which impartial and fair administrative determinations subject to expeditious and adequate judicial review are afforded.'" *Id.* at 79 (citations omitted). *Burford* abstention was proper because:

> The Maryland statutes and regulations, however, contain a comprehensive regulatory scheme governing the operation of landfills and the statute reflects a state legislative policy of closely monitoring landfill operations. *See* Md. Health Environ. Code Ann. § 9–210 *et seq.* (1984); Md.Admin.Code Tit. 9. As the district court noted, the state regulations governing landfill operations are lengthy and detailed and involve complex scientific questions that must be reviewed before a permit for a waste disposal facility is approved. The *Burford* requirement that a complex state regulatory scheme

be involved in order for a district court to abstain is sufficiently present in this case.

> Additionally, land use questions, especially those that involve the regulation of trash dumps, are the peculiar concern of local and state governments, and traditionally, federal courts have not interfered with state courts in the area of land use policy.

*Id.* (citations omitted).

■ The defendants maintain that *Burford* abstention in the present case is appropriate because the State of West Virginia has a complex scheme for regulating landfills and because it has an important interest to protect by doing so. It may be conceded that the State of West Virginia has an important interest in regulating the conduct at issue. However, as observed earlier, there is no complex regulatory scheme at issue dealing with the transportation and disposal of out-of-state solid waste. Similarly, the issue presented does not involve "complex scientific questions," but rather the application of the Commerce Clause to the facts of this case generated as a result of the executive order. *See id.* Inasmuch as adjudication of the present controversy does not threaten an interference with a "complex state regulatory scheme," *Burford* abstention is plainly unwarranted. In that abstention is not proper, the court will proceed to address the substantive federal issues.

## II. Commerce Clause

■ The Commerce Clause of the United States Constitution provides that Congress has the power "[t]o regulate commerce with foreign nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3, n. 10. Although the Commerce Clause limits the power of the states to erect barriers against interstate commerce, the states retain some authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected. *Maine v. Taylor*, 477 U.S. 131, ——— ———, 106 S.Ct. 2440, 2447–48, 91 L.Ed.2d 110, 120–21

(1986). State laws which discriminate against articles of commerce coming from outside the state are invalid "unless there is some reason, apart from their origin, to treat them differently." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 627, 98 S.Ct. 2531, 2537, 57 L.Ed.2d 475 (1978). Moreover, it is clear that solid waste is an item of interstate commerce protected by the Commerce Clause when it is transported across state lines. *Id.* at 622, 98 S.Ct. at 2537.

In *City of Philadelphia*, the State of New Jersey enacted legislation stating in pertinent part:

> "No person shall bring into this State any solid or liquid waste which originated or was collected outside the territorial limits of the State, except garbage to be fed to swine in the State of New Jersey, until the commissioner [of the State Department of Environmental Protection] shall determine that such action can be permitted without endangering the public health, safety and welfare and has promulgated regulations permitting and regulating the treatment and disposal of such waste in this State." N.J.Stat.Ann. § 13:11–10 (West Supp.1978).

*Id.* at 618–19, 98 S.Ct. at 2532–33. The statute was challenged by private landfills in New Jersey and by their out-of-state customers. The New Jersey Supreme Court found the statute constitutional in that it advanced vital health and environmental objectives with little burden on interstate commerce. The plaintiffs appealed to the United States Supreme Court which reversed, holding that the statute violated the Commerce Clause. *Id.* at 617, 98 S.Ct. at 2531.

Initially, the Court considered whether solid waste should be classified as items of commerce. It recognized prior holdings that states can prohibit the importation of some objects because they "are not legitimate subjects of trade and commerce." *Id.* at 622, 98 S.Ct. at 2534 (*citing Bowman v. Chicago & Northwestern R. Co.*, 125 U.S. 465, 489, 8 S.Ct. 689, 700, 31 L.Ed. 700 (1888)). Thus, it has been held that a state may exclude items "which on account of their existing condition would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption." *Bowman* at 489, 8 S.Ct. at 700; *see also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 525, 55 S.Ct. 497, 501, 79 L.Ed. 1032 (1935) (law prohibiting importation of milk unless imported from a state with certain minimum pricing held invalid).

The Court, however, concluded that cases permitting the exclusion of inherently harmful articles were not controlling. In that regard, the Court stated:

> All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset. In *Bowman* and similar cases, the Court held simply that because the articles' worth in interstate commerce was far outweighed by the dangers inhering in their very movement, States could prohibit their transportation across state lines. Hence, we reject the state court's suggestion that the banning of "valueless" out-of-state wastes by ch. 363 implicates no constitutional protection.

*City of Philadelphia*, 437 U.S. at 622, 98 S.Ct. at 2534–35.

■ Even if an article of interstate commerce is potentially hazardous, a state statute barring its importation is invalid if it is basically a protectionist measure. *Id.* at 623, 98 S.Ct. at 2535. On the other hand:

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well

with a lesser impact on interstate activities."

*Id.* at 624, 98 S.Ct. at 2535 (*quoting Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

The State of New Jersey argued that the statute at issue was not a protectionist measure because its goal was to diminish threats to the environment rather than to benefit the State's economy. The Court rejected this argument, asserting:

This dispute about ultimate legislative purpose need not be resolved, because its resolution would not be relevant to the constitutional issue to be decided in this case. Contrary to the evident assumption of the state court and the parties, the evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim of ch. 363 is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect, ch. 363 violates this principle of nondiscrimination.

*Id.* at 626–27, 98 S.Ct. at 2536–37 (emphasis in original). In that the New Jersey statute discriminated against out-of-state commerce, it "falls squarely within the area that the Commerce Clause puts off limits to state regulation." *Id.* at 628, 98 S.Ct. at 2537.

The Court observed that certain quarantine laws have been upheld against attacks based on the Commerce Clause. *Id.* However, those laws banned importation of articles such as diseased livestock that "re-quired destruction as soon as possible because their very movement risked contagion and other evils." In conclusion, the Court stated:

The New Jersey statute is not such a quarantine law. There has been no claim here that the very movement of waste into or through New Jersey endangers health, or that waste must be disposed of as soon and as close to its point of generation as possible. The harms caused by waste are said to arise after its disposal in landfill sites, and at that point, as New Jersey concedes, there is no basis to distinguish out-of-state waste from domestic waste. If one is inherently harmful, so is the other. Yet New Jersey has banned the former while leaving its landfill sites open to the latter.

*Id.* at 629, 98 S.Ct. at 2538.

The defendants contend that the *City of Philadelphia* case may be distinguished. According to the defendants, the executive order "does not prohibit out-of-state waste merely because it originates out-of-state. Rather, West Virginia seeks to prohibit such waste because West Virginia cannot exercise any degree of supervision over the sources [of] such waste." Defendants' Memorandum at 7. In addition, the defendants argue that a recent Supreme Court case, *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), signals a shift away from the analysis articulated in *City of Philadelphia.*

In *Taylor,* a Maine statute which prohibited the importation of baitfish was challenged. A United States district court upheld the statute, finding that the statute had a legitimate and substantial purpose in preventing the introduction of baitfish parasites into local fish populations and that there was no less discriminating means of protecting against baitfish parasites as adequate protection methods were unavailable. The First Circuit Court of Appeals reversed, holding that the statute violated the Commerce Clause. On appeal, the Supreme Court reversed the judgment of the court of appeals. *Id.* at ——, 106 S.Ct. at 2444–47, 91 L.Ed.2d at 117–20.

At the district court level, several experts testified that there was no satisfactory way to inspect shipments of live baitfish for parasites. They opined that the small size of baitfish and the large quantities in which they are shipped made inspection of comingled species "a physical impossibility." *Id.* at 141, 106 S.Ct. at 2449, 91 L.Ed.2d at 123. The district court credited this testimony. *Id.* In addition, the district court made a factual finding that out-of-state baitfish parasites posed significant threats to Maine's unique fish population, not present with respect to in-state baitfish.

On review, the Supreme Court asserted that:

Although the proffered justification for any local discrimination against interstate commerce must be subjected to "the strictest scrutiny," *Hughes v. Oklahoma,* 441 US [322] at 337, 60 L Ed 2d 250, 99 S Ct 1727 [1737 (1979)], the empirical component of that scrutiny, like any other form of factfinding, " 'is the basic responsibility of district courts,' " *Pullman-Standard v Swint,* 456 US 273, 291, 72 L Ed 2d 66, 102 S Ct 1781 [1791] (1982), quoting *DeMarco v. United States,* 415 US 449, 450, n, 39 L Ed 2d 501, 94 S Ct 1185 [1186, n.] (1974).

*Id.* at 144–45, 106 S.Ct. at 2451, 91 L.Ed.2d at 125. Inasmuch as the factual findings were not clearly erroneous, they were accepted for purposes of review. *Id.* at 146, 106 S.Ct. at 2452, 91 L.Ed.2d at 126. Once credited, the factual findings illustrated that less restrictive alternatives to protecting the environment were nonexistent. *Id.*

In holding that the statute did not violate the Commerce Clause, the Supreme Court stated:

"[T]he constitutional principles underlying the commerce clause cannot be read as requiring the State of Maine to sit idly by and wait until potentially irreversible environmental damage has occurred or until the scientific community agrees on what disease organisms are or are not dangerous before it acts to avoid such consequences." 585 F Supp, at 397.

Nor do we think that much doubt is cast on the legitimacy of Maine's purposes by what the Court of Appeals took to be signs of protectionist intent. Shielding in-state industries from out-of-state competition is almost never a legitimate local purpose, and state laws that amount to "simple economic protectionism" consequently have been subject to a "virtually per se rule of invalidity." *Philadelphia v. New Jersey,* 437 US 617, 624, 57 L Ed 2d 475, 98 S Ct 2531 [2535] (1978); accord, e.g., *Minnesota v. Clover Leaf Creamery Co.,* 449 US 456, 471, 66 L Ed 2d 659, 101 S Ct 715 [727] (1981). But there is little reason in this case to believe that the legitimate justifications the State has put forward for its statute are merely a sham or a "post hoc rationalization." *Hughes,* 441 US, at 338, n 20, 60 L Ed 2d 250, 99 S Ct 1727 [at 1737, n. 20].

*Id.* at 148–49, 106 S.Ct. at 2453–54, 91 L.Ed. 2d at 127–28. In that the statute had legitimate reasons to treat articles of interstate commerce differently from articles in-state, apart from their origin, it did not constitute the type of arbitrary discrimination prohibited under the Commerce Clause. *Id.* at 151, 106 S.Ct. at 2455, 91 L.Ed.2d at 129.

■ Contrary to the position of the defendants, the *Taylor* case is distinguishable from the case at bar for two significant reasons. First, there is no evidence that out-of-state asbestos poses a significantly different threat than asbestos located in the State of West Virginia. Indeed, the parties have stipulated that:

Neither of the parties has reason to believe that the asbestos disposed of by Industrial Maintenance Service, Inc. inside the State of West Virginia but which is generated outside the borders of the State of West Virginia is dissimilar in nature to asbestos disposed of by Industrial Maintenance Service, Inc. and which is generated within the borders of the State of West Virginia.

Agreed Order at 4. Further, the defendants' expert witness testified that in-state solid waste is inspected at its origin only about fifteen to twenty times a year and that the waste inspected represents a min-

**444**

iscule portion of solid waste generated within West Virginia each year. The defendants' expert opined that it is technologically feasible to inspect both in-state and out-of-state asbestos at the site of the dump, but that limited resources now preclude such an inspection scheme. Consequently, the argument that out-of-state asbestos poses a special danger because it cannot be inspected at its source is without merit. The lack of resources possessed by the State operates nearly equally on in-state and out-of-state asbestos.

Second, the executive order establishes a clear intent to discriminate against interstate commerce without assigning in specific terms a legitimate need for such extreme action in light of the Commerce Clause:

> WHEREAS, the particular needs of the local citizens and business entities must be met before consideration is given to solid waste disposal from identities located without the State of West Virginia in order to satisfy public health, safety and welfare considerations; ...

Executive Order No. 6–87. Hence, the executive order plainly violates the Commerce Clause as interpreted by the Supreme Court of the United States in *City of Philadelphia*, 437 U.S. 617, 98 S.Ct. 2531.

Accordingly, for the reasons given above, it is hereby ORDERED that the defendants, their agents, servants, employees, and all persons acting under their direction or in concert with them, are hereby restrained and enjoined from enforcing Executive Order No. 6–87 against the plaintiff by prohibiting the importation and disposal at plaintiff's permitted West Virginia solid waste landfill of solid waste, including asbestos, which originates or is generated outside of the State of West Virginia while permitting such disposal of similar solid waste, including asbestos, which originates or is generated within the State of West Virginia or by discriminating against the plaintiff because it accepts similar solid waste from both within and outside the State of West Virginia.