NORTHEAST SANITARY LANDFILL, INC., and Container Corp. of Columbia

v.

SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and Michael D. Jarrett in his Official Capacity as Commissioner.

Civ. A. No. 3–90–2296–17.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 3, 1992.
Nunc Pro Tunc Feb. 17, 1994.

William Thomas Lavender, Jr., Davis & Lavender, Columbia, SC, for plaintiffs.

Samuel Leon Finklea III, Walton J. McLeod III, Elizabeth Bartlett Partlow, S.C. Department of Health & Environmental Control, Office of Gen. Counsel, Columbia, SC, for defendants.

## ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

The plaintiffs, Northeast Sanitary Landfill, Inc. ("NSL") and Container Corporation of Carolina ("CCC") brought this action seeking declaratory and injunctive relief against the defendants, the South Carolina Department of Health and Environmental Control ("DHEC") and Michael D. Jarrett ("Jarrett") in his official capacity as Commissioner. This matter is before the court pursuant to defendants' motion for dismissal and plaintiffs' motion for summary judgment.

Plaintiffs originally sought summary judgment on two separate grounds. First, plaintiffs asserted that DHEC lacked the statutory authority to promulgate certain regulations at issue in this litigation, and, therefore, DHEC could not enforce restrictions placed upon NSL's permits pursuant to these void regulations. Second, plaintiffs asserted that DHEC's application of the Nonhazardous Solid Waste Management Planning Regulations, 25A S.C.Code Regs. 61–100 (1990 Supp.) ("Regulation 61–100") and the South Carolina Solid Waste Policy and Management Act of 1991, 1991 S.C.Acts No. 63 (amending S.C.Code Ann. §§ 44–96–10 to – 460) ("Act"), imposed a substantial burden on interstate commerce and thus violated the Commerce Clause of the United States Constitution, U.S. Const. art. I, § 8, cl. 3.

DHEC originally sought a dismissal of the case on five separate grounds. First, DHEC asserted that plaintiffs' lack of statutory authority claim was moot. Second, DHEC asserted that the federal court should abstain from deciding the Commerce Clause issue because there existed an unsettled area of state law that should be first decided by the state courts. Third, DHEC asserted that a complex state administrative process should be complied with prior to suit in federal court. Fourth, DHEC asserted that plaintiffs' failure to exhaust its administrative remedies barred this action. Finally, DHEC asserted that the action against the state was barred by the Eleventh Amendment.

## STATEMENTS OF FACTS

The following facts are not in dispute:

NSL desired to construct and operate a sanitary landfill in Richland County, South Carolina, to receive nonhazardous solid waste from locations within and without South Carolina, and had knowledge, information, and belief that there were numerous individuals, corporations or other business entities that generated waste from areas outside Richland County and outside the state of South Carolina that were willing to enter into agreements to use the facility. CCC is, and has been, in the business of solid waste collection and seeks to enter into agreements with sanitary landfills located in North and South Carolina, including that of NSL, for the disposal of nonhazardous solid waste.

On April 6, 1988, NSL submitted an application to DHEC, pursuant to 25 S.C.Code Regs. 61–70 (1988), to construct and operate a nonhazardous waste landfill facility in Richland County, South Carolina. In connection with its application, NSL submitted all information requested by DHEC, made all revisions in its application as requested by DHEC, and had complied with all of the requirements of the regulations existing on August 1, 1988.

On August 22, 1988, DHEC advised NSL that the application was complete, but that DHEC would take no further action because the South Carolina Board of Health and Environmental Control, the policy-making body of DHEC, had, on August 13, 1988, adopted a resolution that contained a "Statement of Policy" ("Resolution") requiring that applications for waste treatment facilities and solid and hazardous waste disposal facilities be evaluated on the basis of a "need" for the facility within the State of South Carolina. The Resolution was not published or promulgated as a regulation in compliance with S.C.Code Ann. § 1–23–110 (Law.Co-op.1976).

On October 20, 1988, DHEC promulgated as an emergency regulation ("Emergency Regulation") a provision which: (1) required applicants for permits for nonhazardous solid waste facilities to demonstrate that there was a need for the facility within the county or

regional planning area;[1] (2) precluded consideration of the waste generated outside of the county or regional planning area in determining whether there was a need for the facility; and (3) precluded waste generated outside the county or regional planning area from being deposited in any facility permitted by DHEC without the prior approval of DHEC.

On November 1, 1988, DHEC issued to NSL a permit for the construction and operation of a solid waste disposal facility for nonhazardous solid waste, which included the following restrictions:

> No solid waste generated outside the State shall be received without written approval from the Department. The generator of such waste shall provide information satisfactory to the Department that such waste can be managed in a manner protective of public health and the environment. Such information shall include but not be limited to: (a) Analyses sufficient to fully characterize the waste and demonstrate that the waste is nonhazardous; and (b) Demonstration of financial capability.

November 1988 Permit, condition 5 and

> This site is limited to waste generated in the following counties: Calhoun, Kershaw and Sumter, in addition to the Central Midlands Regional Planning Area (Fairfield, Lexington, Newberry and Richland).

November 1988 Permit, condition 13.

The permit, as amended on March 8, 1990, no longer includes the restriction set forth in permit condition 5, above, however, permit condition 14 of the March 1990 Amended Permit does include the restriction set forth in Permit condition 13 of the November 1988 permit.[2]

The Emergency Regulation expired on January 20, 1989. NSL requested that the condition restricting the source of the waste disposed of in the facility be deleted, but DHEC refused to process the request.[3]

CCC maintains a solid waste transfer station in Fort Mill, South Carolina, which receives nonhazardous solid waste, in part, from out-of-state generators. On November 7, 1989, DHEC authorized CCC to dispose of nonhazardous solid waste from its Fort Mill transfer station, including that generated outside of South Carolina, at the Chester County, South Carolina sanitary landfill.

DHEC promulgated Regulation 61–100, which became effective on January 26, 1990, and which was substantially the same as the Emergency Regulation previously promulgated. Regulation 61–100 provides:

> No permit to construct a new solid waste management facility or to expand an existing solid waste management facility may be issued until the demonstration of need is approved by the Department.... [61–100 I.(C)]

> For purposes of demonstrating need, waste generated outside the county or regional planning area shall not be included unless the Department approves an alternate planning area for purposes of this regulation.... [61–100 III.(C)]

> Facilities for which a permit is issued pursuant to this regulation shall not receive waste from outside the county or regional planning area, whichever, the applicant

---

1. The regional planning areas are defined by S.C.Code Ann. § 6–7–110 (Law.Co-op.1976).

2. Although Regulation 61–100 IV authorizes DHEC to prohibit facilities from receiving waste outside the county or region "without the prior approval by [DHEC]," there appears to be no authority in the Regulations or Act for DHEC to make an outright ban.

   While conditions 5 and 13 of NSL's original permit appear contradictory, and may have allowed NSL to receive waste from outside the state if it received DHEC's permission based upon the showing that the out-of-state waste met the nonhazardous standards of South Carolina law, condition 14 expressly bans waste from outside the seven-county region and constitutes an outright ban.

3. In fact, NSL alleges that DHEC also refused to process another request regarding the operation of additional portions of the landfill. Thereafter, NSL withdrew its request that DHEC delete the geographical restrictions, and thereupon, DHEC favorably processed NSL's request to open a new portion of the previously permitted landfill.

elected to serve, without the prior approval by the Department. [61–100 IV.]

S.C.Code Regs. § 61–100 (Supp.1990).

On June 21, 1990, in response to a request from NSL to delete from its permit any restrictions based upon the origin of the waste, DHEC denied its request based upon Regulation 61–100, even though by its terms it only applies to those who seek to "establish or expand" a nonhazardous solid waste facility.

On July 31, 1990, and August 1, 1990, CCC and NSL requested DHEC's approval for NSL to accept, at NSL's Richland County sanitary landfill, nonhazardous solid waste from CCC's Fort Mill transfer station. These requests were denied on August 17, 1990, although identical waste streams had previously been approved by DHEC for disposal at the Chester County, South Carolina, sanitary landfill. Plaintiffs alleged that DHEC denied the request of CCC to dispose of nonhazardous waste generated outside of South Carolina without substantial justification and that such denial has the effect of preventing nonhazardous solid waste generated in other states and transported in interstate commerce from being deposited in the NSL facility. At oral argument, counsel for DHEC stated that the requests were denied because NSL's permit was restricted to waste generated within its seven-county region.

On May 27, 1991, the Act became effective. The Act prohibits the construction of a new, or the expansion of an existing, solid waste management facility, absent the demonstration of a need for such construction or expansion. 1991 S.C.Acts No. 63, § 1 (adding S.C.Code Ann. § 44–96–290(E)). The Act further provides that in considering a demonstration of need to construct a new facility or expand an existing facility, DHEC may only consider the amount of waste generated in South Carolina. 1991 S.C.Acts No. 63, § 1 (adding S.C.Code Ann. § 44–96–290(F)).[4] Finally, the Act provides that:

> All rules, regulations, standards, orders, or other actions of the department in effect on the date of the enactment of this act, not inconsistent with this act, shall remain in effect unless specifically changed or voided by the Board of Health and Environmental Control or changed by statute.

1991 S.C.Acts No. 63, § 3.

## PROCEDURAL HISTORY

DHEC originally filed its motion for dismissal on November 1, 1990, and the plaintiffs originally filed their motion for summary judgment on April 16, 1991. The parties, however, agreed to postpone their motions until the General Assembly had completed its actions on the Act. After the Act became effective on May 27, 1991, the plaintiffs filed an amended complaint, and the parties renewed their motions.

At oral argument on October 4, 1991, the plaintiffs conceded that the May 27, 1991 enactment of the Act mooted its argument that DHEC lacked the statutory authority to enact the disputed regulations.[5] Similarly

---

4. Section 44–96–290(F) differs from Regulation 69–100. Regulation 69–100 requires a showing of need based upon the amount of waste generated in the county or regional planning area where the facility is to be located. Section 44–96–290(F) requires a showing of need based solely on the amount of waste generated in South Carolina.

5. Originally, DHEC had asserted an estoppel argument with respect to NSL's request for the deletion of condition 14 of the Amended Permit. DHEC asserted that NSL agreed to the condition in order to receive its permit, and therefore, was estopped from later challenging it. When NSL withdrew its claim that DHEC lacked the statutory authority to enact the regulations involved in this case, it did not withdraw its constitutional attack on the regulations or their application.

DHEC apparently never argued that NSL was estopped from asserting that the regulations were unconstitutional.

To the extent that DHEC might argue that NSL was estopped from asserting the unconstitutionality of the permit conditions imposed by DHEC, this court finds that NSL has the right to collaterally attack the constitutional validity of regulations and their application. *Lutheran Church v. New York*, 27 A.D.2d 237, 278 N.Y.S.2d 1 (N.Y.App.Div.1967) (an administrative act can be attacked at any time on a constitutional ground); *Asian Americans For Equality v. Koch*, 129 Misc.2d 67, 492 N.Y.S.2d 837 (Sup.Ct.1985) (when review is upon constitutional grounds and not a question of reasonableness, it is not time-barred); *see Director, Office of Workers' Compensation Programs v. Drummond Coal Co.*, 831 F.2d 240, 243 (11th Cir.1987) ("Where ... the un-

DHEC conceded that (1) abstention is inappropriate;[6] (2) the Eleventh Amendment would not prevent the court from enjoining state officials;[7] and (3) nonhazardous waste is an article of commerce.[8]

Thus, the only matter remaining for this court to decide is whether the challenged portions of Regulation 61–100 and the Act are constitutional, facially and as applied, in light of the Commerce Clause of the United States Constitution.

## LEGAL ANALYSIS

■ The United States Constitution gives Congress the power to regulate commerce among the States.[9] The Commerce Clause also limits the authority of the states to discriminate against interstate commerce. *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988); *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534–35, 69 S.Ct. 657, 663–64, 93 L.Ed. 865 (1949). "The negative or dormant Commerce Clause 'prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Hazardous Waste Treatment Council v. South Carolina,* 945 F.2d 781, 789 (4th Cir.1991) (quoting *New Energy,* 486 U.S. at 273–74, 108 S.Ct. at 1807–08). The dormant Commerce Clause is therefore a " 'substantive restriction on permissible state regulation' of interstate commerce." *Id.* (quoting *Dennis v. Higgins,* 498 U.S. 439, 447, 111 S.Ct. 865, 870, 112 L.Ed.2d 969 (1991), and

voiced objection asserts that the administrative body lacked jurisdiction or authority to act as it did, the objection is quasi-jurisdictional in nature and is not waived by a failure to raise the issue below."); *see also United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 38, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (order outside agency's jurisdiction is one that "even in the absence of a timely objection ... should be set aside as a nullity."); *cf. N.L.R.B. Union v. Federal Labor Relations Authority,* 834 F.2d 191, 195 (D.C.Cir.1987) (A party can collaterally attack regulations on the ground that the agency acted in excess of its statutory authority in promulgating them. A collateral challenge of an agency's authority may even "be raised ... by way of defense in an enforcement proceeding.")

6. DHEC cited *Hazardous Waste Treatment Council v. South Carolina,* 945 F.2d 781, 788–89 n. 10 (4th Cir.1991), as the reason for withdrawing its abstention claim.

7. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

8. In *Hazardous Waste Treatment Council v. South Carolina,* 945 F.2d 781, 790 n. 13 (4th Cir.1991), the Fourth Circuit stated that any argument that hazardous waste is not an object of commerce would·"appear untenable." (citing *National Solid Waste Management Ass'n v. Alabama Dep't of Envtl. Management,* 910 F.2d 713, 718–19 (11th Cir.1990)). Such an argument with respect to nonhazardous waste would also seem to be untenable. *See Philadelphia v. New Jersey,* 437 U.S. 617, 621–23, 98 S.Ct. 2531, 2534–35, 57 L.Ed.2d 475 (1978); *Government Suppliers Consolidating Serv., Inc. v. Bayh,* 753 F.Supp. 739 (S.D.Ind. 1990).

Although DHEC did not raise the so called "quarantine" exception, this court will briefly address it. After Judge Matthew J. Perry's decision to grant a preliminary injunction in *Hazardous Waste Treatment Council v. South Carolina,* 766 F.Supp. 431 (D.S.C.1991), an article in the *South Carolina Lawyer* entitled "The Fight to Keep Out-of-State Wastes Out-of-State" criticized that decision. South Carolina Law., May/June 1991, at 17. The authors of that article suggest that hazardous waste should be treated as "noxious articles," which are not treated as articles of commerce and may be banned from importation into a state. *See Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (Court upheld statute that prohibited certain baitfish from importation because the baitfish contained a parasite that would have a serious detrimental effect on Maine's fisheries); *Clason v. Indiana,* 306 U.S. 439, 59 S.Ct. 609, 83 L.Ed. 858 (1939) (Court upheld an Indiana statute that prohibited the transportation of large dead animals into or within the state).

The courts, however, have uniformly and without exception rejected the argument that waste can be banned from importation into a state under the quarantine exception. *Philadelphia v. New Jersey,* 437 U.S. 617, 628–29, 98 S.Ct. 2531, 2537–38, 57 L.Ed.2d 475 (1978); *Hazardous Waste Treatment Council v. South Carolina,* 945 F.2d 781, 790 (4th Cir.1991); *National Solid Wastes Management Ass'n v. Alabama Dep't of Envtl. Management,* 910 F.2d 713, 718–19 (11th Cir.1990); *BFI Medical Waste Systems, Inc. v. Whatcom County,* 756 F.Supp. 480, 486 (W.D.Wash.1991); *Industrial Maintenance Serv., Inc. v. Moore,* 677 F.Supp. 436, 440–44 (S.D.W.Va.1987).

9. U.S. Const. art. I, § 8, cl. 3: "[t]he Congress shall have power ... to regulate Commerce with foreign Nations, and among the several States...."

*Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)).

Justice Cardozo observed that the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935). Furthermore, Justice Jackson, in *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 537–38, 69 S.Ct. 657, 664–65, 93 L.Ed. 865 (1949), stated: "[t]his principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units." As a result, the Court has concluded that "what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation." *Baldwin,* 294 U.S. at 527, 55 S.Ct. at 502.

The Court has recognized the "evils of 'economic isolation' and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *Philadelphia v. New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978). The Court has developed a two-tier approach to determining whether the burdens placed on interstate commerce by a state statute are constitutionally permissible. If the statute "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). However, "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected," and "[t]he clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535. Thus, if the statute is discriminatory on its face or in practical effect, "the state bears the burden of justifying the discrimination by showing the following: (1) the statute has a legitimate local purpose; (2) the statute serves this interest; and (3) nondiscriminatory alternatives, adequate to preserve the legitimate local purpose, are not available." *Government Suppliers Consolidating Serv. v. Bayh,* 753 F.Supp. 739, 763 (S.D.Ind.1990). *See Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951).

Of binding precedential value in this case is the Supreme Court's decision striking down, on Commerce Clause grounds, New Jersey's efforts to construct a barrier to the shipment of waste for treatment and disposal in that state. The New Jersey statute provided that "[n]o person shall bring into this State solid or liquid waste which originated or was collected outside the territorial limits of the State...." *Philadelphia,* 437 U.S. at 618, 98 S.Ct. at 2535. The Court stated:

> [I]t does not matter whether the ultimate aim of [New Jersey's protectionist law] is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents' pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of all waste into the State's remaining landfills, even though interstate commerce may be incidentally affected. But whatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, *apart from their origin,* to treat them differently.

*Id.* at 626–27, 98 S.Ct. at 2536–37. *See also National Solid Waste Management Ass'n v. Alabama Dep't of Envtl. Management,* 910 F.2d 713 (11th Cir.1990) (statute prohibiting transfer of hazardous waste from states that have not met certain requirements held unconstitutional); *National Solid Waste Management Ass'n v. Voinovich,* 763 F.Supp. 244 (S.D.Ohio 1991) (statute that taxes out-of-

state waste at higher rate than in-state waste held unconstitutional). *Government Suppliers Consolidating Serv. v. Bayh,* 753 F.Supp. 739 (S.D.Ind.1990) (statute requiring disproportionate fees for out-of-state waste and certification procedures for bringing waste to disposal sites held unconstitutional); *Industrial Maintenance Serv., Inc. v. Moore,* 677 F.Supp. 436 (S.D.W.Va.1987) (court held unconstitutional an executive order of the governor of West Virginia that in effect discriminated against out-of-state waste);

The Fourth Circuit's recent opinion in *Hazardous Waste* is of even greater precedential value. In that case the court was dealing with South Carolina statutes, regulations, and executive orders relating to hazardous waste disposal. Regulation 61–99, 25A S.C.Code Regs. 61–99 (Supp.1990) [10], which regulates hazardous waste disposal, contains a similar provision that precludes the issuance of a permit unless there is a showing of a "need" for the facility. In *Hazardous Waste* the court noted:

> [T]he requirement that private groups seeking to obtain in South Carolina a permit to construct a new hazardous waste treatment facility must demonstrate "need" where "need" may not include out-of-state need (even that pursuant to a regional or interstate agreement to which South Carolina is a party) and must con-

sider the reduction of in-state need by exportation, appears to be an attempt to block South Carolina from the nationwide problem. On its face, Regulation 61–99 appears not to regulate evenhandedly. It permits South Carolina to refuse to allow new construction if all of its waste can be disposed of by exportation. The "practical effect" [citation omitted] of the regulation may be to favor in-state interests over out-of-state interests. All in all, however, the issue is too complex and possibly fact-dependent to allow determination on the merits at the preliminary injunction stage.[11]

*Hazardous Waste,* 945 F.2d at 791 n. 14. Thus, without expressly holding that the "need" requirement in regulation 61–99 was facially unconstitutional, the court clearly indicated that the state has the burden of showing that this "need" requirement does not unduly burden interstate commerce.

▆▆▆ Thus, the initial query in this case is whether Regulation 61–100 and the Act operate to discriminate against interstate commerce or merely impose an incidental burden thereon. The motive behind the enactment of the Regulations and the Act apparently was to protect state resources by restricting the flow of waste into South Carolina.[12] Proof of an illegitimate motive, how-

---

10. At oral argument, DHEC admitted that the only difference between the requirements of regulation 61–99, which deals with hazardous waste, and regulation 61–100, which deals with nonhazardous waste, is that the "need" requirement of 61–99 is the need of the state of South Carolina, and the "need" requirement of 61–100 is limited to the need of the regional planning area. In this case the regional planning area consists only of seven counties within South Carolina; therefore, it is a more restricted area than the entire state.

As noted earlier, section 44–96–290(F) of the Act requires a showing of need based solely upon waste generated within South Carolina. Thus, the Act adopts the same standard as that in Regulation 61–99.

11. At oral argument the court asked counsel for DHEC what facts were present that might show that the practical effect of Regulation 61–100 would not be to favor in-state interests over out-of-state interests. DHEC did not offer any facts tending to show that regulation 61–100 would not favor in-state interests.

12. The transcript of the South Carolina Board of Health and Environmental Control meeting on August 13, 1988, contains numerous statements that show that the intent of DHEC in promulgating siting regulations with respect both to hazardous and nonhazardous waste was at least partially to prevent the flow of waste into South Carolina.

For example, Marilyn Ayers, a representative of C.A.S.E., Citizens Asking For a Safe Environment, stated:

> Case is really opposed to any more facilities being located in South Carolina that is [sic] going to deal with things that no other state is willing to take care of. We are incensed that Florida would pass laws—They have stringent laws about their hazardous waste. Everything that they are not allowing them to take care of in Florida is being shipped up here, as well as they're coming from North Carolina and other states, and South Carolina has too many facilities already.... *We want South Carolina to take care of its own, of course .... We need to take care of South Carolina's, but we don't need to be taking care of everybody else's.*

ever, may not be sufficient grounds for finding the statute and regulations unconstitutional.[13] On the other hand, if the practical effect of Regulation 61–100 and the Act is to discriminate against out-of-state waste, then Regulation 61–100 and the Act do not regulate evenhandedly.

DHEC contends that Regulation 61–100 and the Act do not ban out-of-state waste—they merely provide for siting requirements. This argument seems tenuous in light of the facts of this case. In this case, DHEC granted NSL a permit, which contained a restriction that NSL not receive any waste generated outside South Carolina, unless NSL received written consent from DHEC. November 1988 Permit condition 5. Later, DHEC amended the permit to strictly forbid NSL from receiving waste from outside seven counties, including those counties within the Midlands Regional Planning Area. Amended Permit condition 14. On July 31 and August 1, 1990, CCC and NSL requested DHEC approval for NSL to accept nonhazardous waste, generated in North Carolina, from CCC's Fort Mill transfer station. The identical waste stream had been previously approved by DHEC for disposal at the Chester County, South Carolina landfill;[14] however, DHEC denied CCC's and NSL's request. The reason, as admitted by DHEC at oral argument, that DHEC summarily denied NSL's request was because NSL's permit contains a condition that prohibits NSL from receiving waste from outside the seven-county region.[15] Thus, DHEC apparently contends that Regulation 61–100 authorizes DHEC, under the siting provisions, to limit NSL's permit to the receipt of waste generated solely within the seven-county region.

The current application of the Regulation and Act by DHEC allows DHEC to (1) require applicants for a new facility or an expansion of an existing facility to submit to a permit condition that restricts the receipt of waste to that generated within a certain county or region and (2) summarily deny the

Transcript at 5.

In response the Chairman of the Board stated, "and we put [North Carolina] on notice that we're doing some things in this state that will severely restrict their ability to [send their waste into South Carolina]." Transcript at 8.

Specifically with regards to the need requirement for nonhazardous solid waste disposal, Mr. Clarkson, a Board member, explained:

I don't think it's [need requirement] going to solve all of our problems with counties accepting waste from out of the state. . . . A county landfill could simply get a permit, under the guise that we need more capacity for our county, show it, and then fill it up with Okeechobee County's waste from Florida and then say, we've simply got to have more capacity for our county, because ours is filled up again. So its not going to solve all of our problems. . . .

Transcript at 38.

Moreover, the Board acknowledged that the "need" requirement may not solve all of South Carolina's problems, but the Board also implicitly recognized that the objective of the regulation was to serve the waste needs of South Carolina while at the same time preventing the flow of waste from other states into South Carolina. Additionally, the Board recognized that this "need" requirement might be partially effective in reaching this objective.

13. *See Government Suppliers Consolidating Serv. v. Bayh*, 753 F.Supp. 739, 767–68 (S.D.Ind. 1990). The court in *Bayh* quoted *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968):

What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high 'for us to eschew guesswork. We decline to void . . . legislation . . . which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

14. DHEC asserts that the provisions that require landfill facilities to receive written permission before receiving out-of-state waste are to protect the citizens of South Carolina by ensuring that waste brought from outside South Carolina meets all the nonhazardous standards required by South Carolina law. This purpose may well be a valid purpose 'for requiring prior written approval from DHEC; however, in this case DHEC did not deny NSL's request based upon CCC's failure to provide documentation that the waste being transported was nonhazardous.

15. Neither the Act nor Regulation 61–100 expressly grants DHEC the authority to absolutely prohibit a landfill from receiving waste generated outside a county or region. The provisions of the Act and Regulation merely give DHEC the authority to make siting decisions based upon the "need" of the State or the county or region, and Regulation 61–100 merely authorizes DHEC to require its approval prior to allowing waste to be brought from out-of-state. Nonetheless, DHEC amended NSL's permit to prohibit it from receiving waste from outside the regional planning area. *See* Amended Permit condition 14.

importation of waste from outside the region based solely upon that permit condition.

In this case, NSL requested to receive out-of-state waste, under the procedure set forth in condition 5 of NSL's original Permit, and DHEC simply denied the request based upon condition 14 of the Amended Permit. Under this analysis, DHEC has the power, and in this case has exercised the power, to ban waste generated outside the region. Moreover, the effect of DHEC's actual application of the Act and Regulation 61–100 in this case discriminated against waste generated outside the seven-county region.

DHEC apparently did not assert that it is constitutionally permissible to ban waste from outside a county or region so long as it is not a ban set up at the state border; rather, it merely asserted that it was not prohibiting the importation of waste. However, condition 14 of NSL's Amended Permit is such a restriction—it bans waste from outside the seven-county region.

Thus, the controlling issue in this case is whether DHEC's application of Regulation 61–100 and the Act to set up out-of-county or out-of-region bans is constitutionally permissible.

The Ninth and Eleventh Circuits have differed in cases with similar issues. In *Evergreen Waste Systems v. Metropolitan Service District,* 820 F.2d 1482 (9th Cir.1987), the court upheld an ordinance by a three-county region that banned all waste generated outside the region. The court held that the ordinance regulated evenhandedly because it treated wastes from other counties in Oregon that were not in the region the same as wastes from other states. Therefore, the court applied the *Pike* test. As a result the court found that because other landfills were available in Oregon and Washington, the burden on interstate commerce would only be incidental. The court also found that the benefit to the three-county region in that case was substantial because it would give a large metropolitan area, Portland, the critical time it needed to site a new landfill. *But see*

*BFI Medical Waste Systems, Inc. v. Whatcom County,* 756 F.Supp. 480 (W.D.Wash. 1991) (district court within Ninth Circuit held out-of-county ban unconstitutional).

In *Diamond Waste, Inc. v. Monroe County,* 939 F.2d 941 (11th Cir.1991), the court, however, held that a county resolution that banned importation of out-of-county waste was unconstitutional but held constitutional the Georgia statute [16] from which Monroe County may have derived its authority to impose the ban. The court found that the ordinance did not constitute "sheer economic protectionism against out-of-state commerce," because it "treat[ed] interstate and intrastate waste on an equal basis." *Id.* at 944. Therefore, the court applied the *Pike* test. The court then found that Monroe County had a "legitimate legislative interest in extending the life of the only existing landfill within its jurisdiction...." *Id.*

However, the court concluded:

> [W]e are loathe to characterize the possible effects of the resolution on interstate commerce as "incidental." There was evidence that Diamond Waste had already received inquiries concerning the importation of 180 tons of waste daily from outside of Georgia. Although there is at present but one landfill in one county that would be affected by the resolution, were other counties to adopt the same regulation in response, the impact on interstate commerce could be substantial.

*Id.* at 944–45. *See also Dean Milk Co. v. Madison,* 340 U.S. 349, 356, 71 S.Ct. 295, 299, 95 L.Ed. 329 (1951) (ordinance that had the effect of preventing Illinois milk suppliers from selling their milk in Madison held unconstitutional; "[t]o permit Madison to adopt a regulation not essential for the protection of local health interests and placing a discriminatory burden on interstate commerce would invite a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause."); *Dutchess Sanitation Serv., Inc. v. Plattekill,* 51 N.Y.2d 670,

**16.** The Georgia statute provides:

No person ... shall transport ... waste ... across state or county boundaries for the purpose of dumping the same at a publicly or privately owned dump, unless permission is first obtained from the governing authority of the county in which the dump is located.... Ga.Code Ann. § 36–1–16.

676, 435 N.Y.S.2d 962, 965, 417 N.E.2d 74, 77 (1980) (invalidating similar prohibition on out-of-municipality waste; "for purposes of determining the presence of effect on interstate commerce, not only the impact of a particular instance of regulation, but a projection of the cumulative burden that would result if similar regulations were adopted elsewhere is to be considered.")

This court finds the facts of this case are more similar to those in *Diamond Waste* than those in *Evergreen.* For example, in *Evergreen,* the court found a compelling reason why the out-of-county ban was necessary—it afforded the metropolitan area the critical time it needed to site a new facility. In that decision the Ninth Circuit stated that the burden on the plaintiff, an out-of-state corporation that had previously disposed of waste at the facility in question, was incidental in comparison to the critical local interest in that case. In *Whatcom,* however, the district court within the Ninth Circuit clearly distinguished the factual setting of *Evergreen* and held that a county border ban is unconstitutional when there exists an alternative method of protecting the legitimate local concerns with lesser impact on interstate activities. *Id.* at 486 (citing *Pike v. Bruce Church, Inc.* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

The court also finds the legal conclusions in *Diamond Waste* and *Whatcom* to be more persuasive. If a county or region could ban the importation of waste at the county or region border, then the cumulative effect of such bans by all or many of the counties would have the same effect as a state-wide ban. *See also Dean Milk Co. v. Madison,* 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). For example, if all forty-six counties in South Carolina instituted out-of-county bans, then the effect on interstate commerce would be the same as an out-of-state ban. The possibility of a severe cumulative effect is magnified when, as in this case, a state agency is implementing the out-of-county or out-of-region bans. Moreover, if DHEC has the power to implement county and regional bans on the receipt of waste, then DHEC could easily organize a statewide scheme consisting of various regions, each of which prohibits the receipt of waste generated outside

that region. Thus, this court finds that the burden on interstate commerce of DHEC's application of Regulation 61–100 and the Act to institute out-of-region bans on nonhazardous waste, including condition 14 of NSL's Amended Permit, is substantial. Therefore, the court finds that condition 14 of NSL's Amended Permit is unconstitutional and that any action taken by DHEC in enforcing such restrictive provisions would be unconstitutional.

Although the "need" requirement of Regulation 69–100 and the Act may well be facially unconstitutional, the court need not reach this broader question. Unlike *Hazardous Waste,* in which the Hazardous Waste Treatment Council, a corporate trade association, commenced the action seeking a declaratory judgment finding that portions of the South Carolina regulations and statutes are facially unconstitutional, plaintiffs commenced this action seeking to enjoin DHEC from further enforcement of a restrictive condition in NSL's permit. Moreover, the real issue in this case revolves around DHEC's application of Regulation 61–100 and the Act to force a regional ban on waste. Because the court has addressed this problem and afforded the plaintiffs adequate remedy, the court will proceed no further.

The Supreme Court has held that waste generated outside a state is no more harmful than the waste generated inside a state; thus, discrimination based upon the origin of the waste is impermissible. *See Philadelphia,* 437 U.S. at 629, 98 S.Ct. at 2538. If the state wishes to restrict the amount of waste that is disposed of in a county, region, or the state, it may do so, *see Bayh,* 753 F.Supp. at 770; it just cannot do so by discriminating against waste based upon its origin.

### CONCLUSION

It cannot be disputed that South Carolina has an interest, indeed an overriding duty, to protect human health and the environment. It is equally clear that each of the actions here challenged seek to achieve that worthy goal. But here the plaintiffs challenge only the application of certain laws, the effect of

which is to discriminate against out-of-state waste based solely upon its place of origin. Waste generated out-of-state poses no more threat to human health and the environment than waste generated in South Carolina. Therefore, this court is constrained to declare DHEC's application of Regulation 61–100, as it relates to the prohibition of facilities from receiving nonhazardous waste generated outside a regional area, unconstitutional. The court further enjoins the defendant from further enforcement of condition 14 of NSL's Amended Permit.

IT IS SO ORDERED.